## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| DANA ANDERSON, et al, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Case Number: 2:12-cv-00598-JHE |
| | ) |
| SURGERY CENTER OF CULLMAN, | ) |
| INC., et al, | ) |
| | ) |
|     Defendants. | ) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In their Second Amended Complaint, Plaintiffs Dana Anderson ("Anderson") and Kathy Lackey ("Lackey") (collectively, "Plaintiffs'),[1] allege violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"), and assert state law tort claims against their former employer, other related entities, and a doctor with whom they worked. (Doc. 111). As defendants, Plaintiffs name Surgery Center of Cullman, Inc. ("SCC, Inc."); Surgery Center of Cullman, LLC ("SCC, LLC"); Surgical Care Affiliates, LLC ("SCA"); Cullman Outpatient Surgery, LLC ("COPS"); and Kevin Johnson, M.D. ("Dr. Johnson"). (*Id.*). Plaintiffs assert the following Title VII claims against all defendants except Dr. Johnson:[2] (1) sexual

---

[1] On November 21, 2014, Plaintiffs Kari Walker and Belinda Beverly notified the court that they had accepted offers of judgment in settlement of their claims. (Docs. 173 & 174). The court subsequently dismissed their claims and entered judgment in their favor. (Docs. 175 & 205).

[2] Plaintiffs concede Title VII does not create a cause of action against an individual, but nevertheless assert their Title VII claims against Dr. Johnson "in his capacity as a manger and owner." (*See* doc. 111 at 30 n.1). Dr. Johnson is an individual and not a proper defendant to a Title VII claim. To the extent Plaintiffs attempt to hold COPS liable for Dr. Johnson's actions as "as manager and owner," COPS has also been named as a defendant and any claim against Dr. Johnson in his capacity "as manager and owner" is superfluous.

harassment/hostile work environment, (2) gender discrimination, and (3) retaliation, as well as the following state law claims against all defendants except where noted otherwise (4) negligent and wanton hiring, training, supervision, and retention against all defendants except Dr. Johnson; (5) invasion of privacy, (6) assault and battery, and (7) intentional infliction of emotional distress. (*Id.*).

There are eight pending motions for summary judgment or partial summary judgment. These include:

- SCC, LLC's Motion for Summary Judgment, (doc. 118);

- SCC, Inc.'s Motion for Summary Judgment, (doc. 119);

- SCA's Motion for Summary Judgment as to Lackey's Claims, (doc. 121);

- SCA's Motion for Summary Judgment as to Anderson's Claims, (doc. 123);

- Dr. Johnson's Motion for Partial Summary Judgment, (doc. 132);

- COPS's Motion for Summary Judgment, (doc. 182);

- Plaintiff's Motion for Partial Summary Judgment on certain affirmative defenses (all defendants), (doc. 138);

- Plaintiff's Motion for Partial Summary Judgment on certain affirmative defenses (Dr. Johnson), (doc. 141).

The motions are fully briefed and ripe for review.

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. PROPER DEFENDANTS: Title VII "Employer" Issue and Vicarious Liability for Tort Claims (*See* docs. 118, 119, 132, 182, 121, & 123)

All defendants except for SCA argue Plaintiffs' Title VII claims fail because they are not the Plaintiffs' "employer" for purposes of Title VII. (Docs. 118, 119, 182, 132). Defendants

SCC, Inc.; SCC, LLC; and COPS also argue Plaintiffs' state law tort claims fail because they are not liable for Dr. Johnson's allegedly tortious conduct because he was not their agent and they cannot be vicariously liable for his alleged conduct.  (Docs. 118, 119, 182).  As these are threshold questions, the undersigned addresses these motions directly below, before turning to SCA and Plaintiffs' motions.

### A.  Summary Judgment Facts[3]

Surgery Center of Cullman, Inc. ("SCC, Inc.")[4] is a wholly-owned subsidiary of Surgical Care Affiliates, LLC ("SCA").  (Doc. 124-1 at 10 (37:13-15)).  SCC, Inc. is a member of Surgery Center of Cullman, LLC, ("SCC, LLC"), owning a one-third interest.  (Id. (37:15-18)).  Cullman Outpatient Surgery, LLC ("COPS") is also a member of SCC, LLC, owning the remaining two-thirds interest.  (Id. (37:18-23)).  SCC, LLC does business as the Surgery Center

---

[3] According to Plaintiffs, "[f]or the convenience of the Court and the parties" they filed a single, combined statement of facts "applicable to all of the Defendants' motions for summary judgment.  (See doc. 180 at 1 n.1).   This document, not contemplated by the undersigned's scheduling order, is 244 pages long and contains 1,288 fact paragraphs, largely citing newly submitted declarations from the current and former plaintiffs.  The defendants responded to this fact submissions, paragraph by paragraph, indicating whether they disputed each proffered fact. (Doc. 225).  Additionally, Defendants filed a document entitled "Defendants' Joint Objections and Motion to Strike Inconsistent and Incomplete Statements Produced by Plaintiffs During Summary Judgment Briefing."  (Doc. 226).  This motion is unnecessary because the defendants state their disputes in their response.  See Campbell v. Shinseki, 546 Fed. App'x. 874, 879 (11th Cir. 2013) (explaining the process of disputing a fact at summary judgment and that there is no need to make a separate motion).  Nevertheless, the undersigned has reviewed the submissions from all parties on these facts.  Many of the facts Plaintiffs submit in their combined statement of facts are inconsistent with prior sworn testimony, not supported by the evidence, hearsay, or irrelevant to the issues before the court on summary judgment.  To the extent Plaintiffs attempt to rely on declarations to create evidence through the introduction of hearsay or matters outside of the declarant's personal knowledge, they are improper and do not constitute admissible evidence upon which Plaintiffs may rely in opposition to summary judgment.  This report and recommendation contains those facts upon which Plaintiffs rely in their briefs and which are supported by some evidence.  All legitimate disputes are resolved in the non-movant's favor.

[4] On December 23, 2013, SCC, Inc.'s corporate form was converted and it became SCA Surgery Center of Cullman, LLC.  (Wells Decl., doc. 128-8 at ¶5).  When depositions were taken the entity was named SCC, Inc., and, for clarity, will be referred to as such throughout.

of Cullman ("Surgery Center" or "Facility"), an outpatient surgery facility in Cullman, Alabama that opened in 2006.  (*Id.* (38:3-6)).

Dr. Johnson is an anesthesiologist.   In 2006, Dr. Johnson, through his professional corporation Kevin G. Johnson M.D., P.C., contracted with SCC, LLC to provide anesthesia services to the Surgery Center.  (Doc. 134-3).[5]  From 2006 to March 2011, Dr. Johnson, through a contract between his professional corporation and SCC, LLC, served as the Medical Director of the Surgery Center and provided medical director services.  (*Id.*; *see also* doc. 130-1 at 84 (334:22-335:2); doc. 128-9 at ¶14).  Neither SCC, Inc. nor COPS is a party to either contract.  (Doc. 128-8 at ¶14; doc. 184-1 at ¶7).  Neither SCC, Inc. nor COPS has any contract with Dr. Johnson or Kevin G. Johnson, M.D., P.C.   (Doc.128-8 at ¶14; doc. 184-1 at ¶7).   The anesthesiology and medical director agreements are the only contracts between SCC, LLC and Kevin G. Johnson, M.D., P.C. (Doc. 128-9 at ¶15).  SCC, LLC has no contract with Dr. Kevin Johnson ("Dr. Johnson") in his individual capacity.  (Doc. 128-9 at ¶16).

COPS is a physician-owned entity.  (Doc. 130-1 at 80 (317:9-17).  Dr. Johnson is a member of COPS, owning a ten percent interest.  (*Id.*).  Dr. Windham, and Dr. Marecle are also members with an ownership interest in COPS.  (Doc. 140-27 at 1-2 (69:16-70:12)).   Dr. Windham owns thirteen percent of COPS.  (*Id.*).  No other individual owned a greater percentage of COPS.  (*Id.*).

SCC, LLC did not pay Dr. Johnson or provide him with employment benefits. (*Id.* at ¶18).  SCC, LLC only compensated Kevin G. Johnson, M.D., P.C. in accordance with the terms of the agreements.  (*Id.* at ¶19).  SCC, LLC did not compensate or provide benefits to Kevin G.

---

[5] The contract originally named "Healthsouth/Woodlands Surgery Center of Cullman, LLC" as a party.  This entity is now referred to as Surgery Center of Cullman, LLC, abbreviated "SCC, LLC."

Johnson, M.D., P.C. beyond the terms of their agreements. (*Id.* at ¶20). SCC, LLC did not set work schedules for Dr. Johnson. (*Id.* at ¶21). Although SCC, LLC did not supervise or direct (and did not have the right to supervise or direct) Dr. Johnson's practice of medicine, (*id.* at ¶¶22-23), SCC, LLC has some oversight and rights with respect to Dr. Johnson. The contract between SCC, LLC and Kevin G. Johnson, M.D., PC provided the agreement could be terminated under certain circumstances including "without cause" after ninety days' prior written notice. (Doc. 178-7 at 12-14). The contract also required the Contractor (Dr. Johnson) to report to the Administrator if he believed anyone performing clinical duties failed to meet competency standards. (*Id.* at 3-4). Although, as Medical Director, Dr. Johnson did not report to anyone, (doc. 130-1 at 84 (334:09-11), he was not the highest person in the chain-of-command. Surgery Center Team Meeting notes from March 2010 indicate that, like the Medical Director, Dr. Windham, Chairman of the Board (SCC, LLC), was listed in the same position in the chain-of-command, after "Immediate Supervisor" and "Administrator." (Doc. 140-42). Coy Wells, SCA's Director of Operations, was listed next, then Holly Ramey, Regional Vice President. (*Id.*). The Human Resources Department was listed highest on the chain-of-command. (*Id.*). Additionally, the Administrator, Lori Bates, and the Director of Nursing, Connie Crook, have authority to monitor physician behavior in the workplace. (Doc. 131-1 at 46 (177-78)). And the Board of Representatives and the Medical Executive Committee[6] had authority to discipline physicians for disruptive behavior. (Doc. 140-51). Dr. Johnson never reported to COPS with regard to his job duties or responsibilities. (Doc. 184-1 at ¶8; doc. 130-1 at 84 (334:9-17)).

---

[6] The Surgery Center has a Board of Representatives (the "Board") and a Medical Executive Committee ("MEC"); among other things, the MEC is involved in making sure physician performance complies with policies so the Surgery Center can maintain accreditation. (Doc. 128-4 at 5-6 (20-22)). The Board is the governing body, and the MEC reports information to the Board; the Board is responsible for what happens at the Surgery Center. (*Id.*).

However, several members of COPS, including Dr. Windham, Dr. Marecle, Dr. Berquist, and Dr. Smith, had authority to discipline Dr. Johnson in their capacity as members of SCC, LLC's Board and/or MEC.  (Doc. 140-51).

Under the terms of the agreement with SCC, LLC, Kevin G. Johnson, M.D., P.C. is charged with consulting with and rendering advice to SCC, LLC regarding compliance with clinical standards, records, admission, and discharge criteria, treatment programs, and medical procedures, and providing anesthesia services to patients at the Facility.  (Doc. 128-9 at ¶24). Under the terms of the contract with SCC, LLC, Kevin G. Johnson, M.D., P.C. is also charged with "assisting in the supervision of compliance by the Medical Staff and all clinical and nursing personnel of the Facility with the Company's policies and procedures . . . all applicable laws, rules, regulations, standards, guidelines, policies, procedures and bylaws promulgated by all the applicable Regulatory Authorities" among other duties.  (Doc. 178-7 at 3).

Under the terms of the agreement, Kevin G. Johnson, M.D., P.C. was to maintain time records and be paid on a monthly basis upon delivery of time records.  (Doc. 128-9 at ¶25; *see* doc. 178-7).  No taxes or deductions were withheld from payments. (*Id.* at ¶26; *see* doc. 178-7). Kevin G. Johnson, M.D., P.C. was bound to perform the enumerated services in accordance with applicable laws and policies and procedures of SCC, LLC, to perform the services diligently and in accordance with the custom of similar providers, and to satisfy all continuing education requirements.  (*Id.* at 29; *see* doc. 178-7).  Although the parties could mutually decide to terminate the agreement at any time, unilateral termination of the contract had to be pursuant to the terms of the agreement.  (Doc. 178-7 at 12-15).

Neither Dr. Johnson nor Kevin G. Johnson, M.D., P.C. own shares in SCC, LLC.  (Doc. 128-9 at ¶17).

7

SCA contracted with SCC, LLC to provide SCA employees, such as nurses and support staff to work at the Surgery Center.  (Doc. 134-5; doc. 134-6).  The non-physician employees who work at the Surgery Center are employed by SCA.  (Doc. 134-7 at 5 (15:16-16:1)).  As employees of SCA, Plaintiffs worked at the Surgery Center providing nursing services.  (Doc. 134-4 at 11 (38:17-41:17)).

SCA manages daily operations of the Surgery Center pursuant to the contract with SCC, LLC.  (Doc. 128-8 at ¶9).  SCA receives a management fee for managing the Surgery Center.  (Doc. 124-3 at 4 (13:22-14:11).   SCA hires and fires all of the employees.  (Doc. 124-3 at 3 (11:6-19)).  Neither SCC, LLC nor COPS has (or have they ever had) any employees.  (Doc. 128-9 at ¶37; doc. 128-8 at ¶17; doc. 184-1 at ¶4).  Plaintiffs did not apply for employment with SCC, LLC or COPS, and neither SCC, LLC nor COPS hired Plaintiffs.  (*Id.* at ¶¶7, 9; doc. 184-1 at ¶5).  Neither SCC, LLC nor SCC, Inc. paid Plaintiffs or provided them with benefits such as health insurance.  (Doc. 128-8 at ¶ 13; doc. 178-8 at ¶20).  COPS did not pay Plaintiffs or provide them with benefits such as health insurance.  (Doc. 184-1 at ¶6).  SCA provided Plaintiffs with their paychecks.  (Doc. 173-3 at 4 (15:20-16:01); doc. 178-8 at ¶10).  SCC, LLC compensated Kevin G. Johnson, M.D., P.C. in accordance with the parties' contracts, but did not pay Dr. Johnson.  (*Id.* at ¶¶18, 19).  Neither SCC, Inc. nor COPS paid Dr. Johnson or Kevin G. Johnson, M.D., P.C. or provide Dr. Johnson with benefits such as health insurance.  (Doc. 128-8 at ¶¶11, 15; doc. 184-1 at ¶8).

Neither SCC, LLC nor SCC, Inc. set work schedules or rules for Plaintiffs or have the ability to do so.  (Doc. 128-9 at ¶12; doc. 128-8 at ¶19).  COPS did not set work schedules for Plaintiffs or have the ability to do so.  (Doc. 184-1 at ¶6).  Neither SCC, LLC nor SCC, Inc. supervised, reviewed, or disciplined Plaintiffs or had the ability to do so.  (Doc. 128-9 at ¶11;

doc. 128-8 at ¶19).  COPS did not supervise, review, set rules, or discipline Plaintiffs and did not have the ability to do so.  (Doc. 184-1 at ¶5).  Dr. Johnson did not have the authority to discipline, hire, or fire SCA employees.  (Doc. 130-1 at 81 (323:11-13); doc. 178-8 at ¶13). Plaintiffs contend Dr. Johnson represented having the authority to hire and fire employees. (Doc. 192 at 4, ¶17) (citing doc. 178-3 at ¶ 30, etc.).  Dr. Johnson never requested that any SCA employee be written-up.  (Doc. 130-1 at 81-82 (323:11-13; 325:4-8)).  Dr. Johnson never participated in any discipline of any SCA employee.  (*Id.*).  Dr. Johnson did not report to SCC, Inc. with regard to job duties or responsibilities.  (*Id.* at 84 (334:9-17)).  Neither SCC, Inc. nor COPS set work schedules for Dr. Johnson or directed him in the practice of medicine.  (Doc. 178-8 at ¶16; doc. 184-1 at ¶8).  Although Dr. Johnson was considered in the chain-of-command, he did not manage any of the medical personnel at the facility.  (Doc. 130-1 at 110 (437:17-21)).

Dana Anderson ("Anderson") is a Registered Nurse who was employed as either a recovery room or a post-acute recovery unit ("PACU") nurse from the time the Surgery Center opened in approximately 2006 until March 7, 2012.  (Doc. 178-3 at ¶2).  Anderson was required to work with Dr. Johnson on a daily basis.  (*Id.* at ¶5).  Kathy Lackey ("Lackey") was hired as a Registered Nurse to work in the PACU at the Surgery Center in June 2010, and worked through March 2011.  (Doc. 178-4 at ¶2).  Lackey was required to work with Dr. Johnson on a daily basis.  (*Id.* at ¶3).

The SCA Teammate Handbook has a Corporate Compliance Program, including a Compliance Hotline telephone number that is available to teammates who want to report a violation.  (Doc. 128-10 at ¶6).   Following 2010 hotline calls regarding Dr. Johnson's alleged inappropriate conduct, SCA informed Dr. Greg Windham ("Windham") of the complaints. (Doc. 131-1 at 29 (109:23-110:19)).  Dr. Windham is a Board member of SCC, LLC.  (Doc. 124-

5 at 8 (29:13-30:01)).   After SCA received the anonymous hotline calls, SCA Group Human Resources Manager Lynne Hammack ("Hammack") who worked out of SCA's corporate office in Hoover, Alabama, began an investigation.   (Doc. 131-1 at 3, 27 (9:16-22, 102:5-103:7)). Following the February 2010 investigation, SCA Director of Operations Coy Wells talked to Dr. Johnson about the complaints.   (Doc. 130-1 at 92 (365:12-366:16)).   Dr. Johnson disputes that anyone ever "counseled" him or told him his behavior was inappropriate.   (*Id.*).

After receiving the complaint from Plaintiffs in January 2011, Administrator Lori Bates reported their concerns to SCA Regional Vice President Tom Gill and Dr. Windham.   (Doc. 127-3 at 62, 64 (247:11-21; 256:10-15)).   Bates, Gill, and Windham met with Plaintiffs on January 24, 2011, to discuss their complaints about Dr. Johnson.   (*Id.* at 68-69 (272:21-273:12; doc. 127-4 at 7 (468:14-469:4)).   SCC, LLC's Medical Executive Committee ("MEC") addresses clinical issues involving the facility.   (Doc. 128-9 at ¶31).   Following the investigation into the complaint, the MEC met on March 2, 2011.   (*Id.* at ¶32).   At the March 2, 2011 meeting, the MEC decided to terminate SCC, LLC's Medical Director services agreement with Kevin G. Johnson, M.D., P.C. and requested Dr. Johnson self-report to the Alabama Physician Health Program and take an eight-week leave of absence from the Facility.   (*Id.* at ¶¶32, 36).   SCC, LLC asked if Kevin G. Johnson, M.D., P.C. would agree to immediately terminate the Medical Director services agreement, and Dr. Johnson agreed.   (*Id.* at ¶¶ 33, 34).   Dr. Johnson also agreed to the eight-week leave of absence and to self-report to the Alabama Physician Health Program. (*Id.*at ¶37).   The MEC's meeting minutes indicate Dr. Johnson "voluntarily resigned" as Medical Director, but deposition testimony from Dr. Windham and Smith clarify this was at the MEC's request.   (Doc. 124-7 at 51 (203:20-204:1); doc. 128-4 at 31 (123:9-13)).   The Medical Director services agreement was terminated on March 3, 2011, by agreement of SCC, LLC and Kevin G.

Johnson, M.D., P.C.  (Doc. 128-9 at ¶35).  Dr. Johnson's leave of absence began on March 3, 2011.  (*Id.* at ¶37).

**B.  Analysis**

      **1.  Title VII Claims:**[7] **Defendants' "Employer" Status**

      To maintain a Title VII claim, a plaintiff must establish that the defendant was her employer, which the statute defines as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b).  The only defendant strictly meeting this requirement is SCA.

      This Circuit, however, accords a liberal construction to the term "employer" under Title VII.  *See Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999).  Sometimes courts will look beyond the nominal independence of an entity and ask whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiffs' employer comes within the coverage of Title VII.  This is precisely what Plaintiffs ask this Court to do.  Thus, this is not a question of whether Plaintiffs may assert a Title VII claim, but whether Plaintiffs may also assert these claims against SCC, LLC; SCC, Inc.; COPS, and Dr. Johnson.

      The Eleventh Circuit has identified three circumstances where it is appropriate to aggregate multiple entities for this purpose.[8]  The court has explained as follows:

      First, where two ostensibly separate entities are "'highly integrated with respect to

---

    [7] Plaintiffs assert claims pursuant to Title VII against all defendants, including Dr. Johnson in his capacity as "manager and owner of Defendants . . . ." (Doc. 111 at ¶85 n.1).

    [8] Some cases discuss aggregating entities for the purpose of numerosity, but that is not the situation here.  There is no dispute that SCA has over fifteen employers and is an "employer" under Title VII.

> ownership and operations,'" we may count them together under Title VII. *McKenzie*, 834 F.2d at 933 (quoting *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 726 (N.D. Ala.), aff'd, 664 F.2d 295 (11th Cir.1981)).  This is the "single employer" or "integrated enterprise" test.  Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. *See Virgo*, 30 F.3d at 1359–60. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees. *See Williams*, 742 F.2d at 589. This is the "agency" test. *See generally* 2 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 1309–17 (3rd ed.1996).

*Lyes*, 166 F.3d at 1341.  Plaintiffs contend the defendants are an "integrated enterprise" or "single employer."  (*See* doc. 200 at 48-61).

In considering the "integrated enterprise" or "single employer" theory, the court must ask whether the entities should be treated as a single, integrated enterprise based on the following: (1) common management; (2) interrelations between operations; (3) centralized control of labor relationship; and (4) common ownership.  *Lyes*, 166 F.3d at 1342 (citing *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930 (11th Cir. 1987)). The  showing  required  to warrant a finding of single employer status has been described as "highly integrated with respect to ownership and operations."  *Fike v. Gold Kist, Inc.*, 514 F. Supp. 722, 726 (N.D. Ala. 1981). Liability under this doctrine hinges "on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based."  *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1245 (11th Cir. 1998).

### a.  Single Employer/Integrated Enterprise

SCA contracted with SCC, LLC to provide employees, such as nurses and support staff to work at the Surgery Center (or SCC, LLC).  (Doc. 134-5; doc. 134-6).  SCA owns SCC, Inc., which owns one-third of SCC, LLC.  (Doc. 124-1 at 10 (37:11-38-6)).  COPS, a physician-

owned entity, owns the remaining two thirds of SCC, LLC. (*Id.*). Dr. Windham and Dr. Johnson are members of COPS and, by virtue of COPS' interest in SCC, LLC, are part-owners of SCC, LLC. (*Id.*). Dr. Windham and Dr. Johnson work at the Surgery Center. (*See* docs. 124-5 at 8 (29:13-30:01)) & doc. 134-3). SCC, LLC contracted with Kevin G. Johnson, M.D., P.C. to have Dr. Johnson serve as Medical Director and provide anesthesia services to SCC, LLC. (Doc. 134-3). Although Dr. Johnson's contract was with SCC, LLC, Dr. Johnson testified that Coy Wells, SCA's Director of Operations, could terminate him. (Doc. 130-1 at 102 (107:19-408:13)). Additionally, the manner in which defendants handled Plaintiffs' initial complaints about Dr. Johnson indicates some relationship among the entities.

### 1. Common Management

Under this factor, courts look to who controls the daily operations and who has hiring and firing authority. *See Cruz–Lovo v. Ryder Sys., Inc.*, 298 F. Supp. 2d 1248, 1253 (S.D. Fla.), *aff'd*, No. 03–11247, 2003 WL 23150113, at *1 (11th Cir. Nov.5, 2003) (per curiam) (citing *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 443 (4th Cir.1999), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006)).

The parties do not dispute that SCA manages daily operations of the Surgery Center pursuant to the contract with SCC, LLC. (Doc. 128-8 at ¶9). The evidence establishes SCA hires and fires all of the employees, (doc. 124-3 at 3 (11:6-19)), SCC, LLC does not have (nor has ever had) any employees, (doc. 128-9 at ¶37; doc. 128-8 at ¶17), and Plaintiffs did not apply for employment with SCC, LLC or COPS, and SCC, LLC or COPS did not hire Plaintiffs, (*id.* at ¶¶7, 9; doc. 184-1 at ¶5).

Plaintiffs attempt to show that, despite this agreement, Dr. Windham and Dr. Johnson exert control over the daily operations of the Surgery Center, including who is hired and fired.

Anderson states that when she complained to Mason (Administrator) about Dr. Johnson, Mason told her "Dr. Johnson owns the facility and as Medical Director he can do anything he wants." (Doc. 178-3 at ¶61).  Additionally, according to Anderson, Mason said Windham recommended her for the position of Administrator, and that even though she worked for the corporate office (SCA), Dr. Windham and Dr. Johnson were her real bosses.  (*Id.*).  Mason said Dr. Windham and Dr. Johnson controlled who the corporate office hired and fired.[9]  (*Id.*).

However, Lackey testified in her deposition that Dr. Johnson was not her employer or supervisor, and that Crook, the Director of Nursing, was her supervisor and promoted her in September 2010.  (Doc. 128-1 at 51).  In Anderson's deposition, she testified that she was told Dr. Johnson was a contract-employee.  (Doc. 140-3 at 128).

Although it is undisputed SCA contracted with SCC, LLC to manage daily operations, including HR issues, there are factual disputes as to what degree of control other entities possessed in this regard.  It is unclear whether Dr. Windham and Dr. Johnson asserted control as members of COPS; Dr. Windham as CEO of SCC, LLC; and Dr. Johnson through his contract with SCC, LLC.  However, there is no indication SCC, Inc. had any common management.  Thus, with respect to SCC, Inc., this factor weighs in its favor.  As to the other defendants (SCC, LLC and COPS), this factor weighs slightly in Plaintiffs' favor.

## 2. Interrelations Between Operations

Under this factor, courts look to the companies' office space, boards of directors' meetings, banking operations, and purchases.[10]  *See Hukill*, 192 F.3d at 443.  Importantly,

---

[9] Plaintiffs also state Dr. Johnson would override the decisions of the nurse manager with regard to schedules of nurses, (doc. 200 at 56), but the citation does not support this statement. (*See* doc. 178-2 at 32-33)

[10] Specifically, there are seven indicia of interrelatedness often considered: (1) combined

however, the fact that one company purchases administrative services from the other "is of no consequence." *Id.*; *see also Cruz-Lovo*, 298 F. Supp. 2d at 1253 (noting that purchasing administrative services is not dispositive).

Plaintiffs' sole argument on this factor is that "Defendants' business model is based on a high level of interrelations among various Defendants. (*See* doc. 200 at 56). However, a mutually beneficial, or even mutually dependent, existence does not support a finding of interrelated operations. *Walker v. Boys & Girls Club of Am.*, 38 F. Supp. 2d 1326, 1332-33 (M.D. Ala. 1999) (citing *Webb v. Am. Red. Cross*, 652 F. Supp. 917 (D. Neb. 1986)). Furthermore, the existence of the management agreement through which SCA provided services to SCC, LLC and SCA was compensated for services rendered does not integrate the entities. *See Skinner v. Legal Advocacy Ctr. of Cent. Fla., Inc.*, No. 6:11-cv-1760-Orl-37KRS (M.D. Fla. Oct. 21, 2013) (quoting *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 443 (4th Cir. 1999).

Plaintiffs fail to offer substantial evidence of interrelations between operations, (*see* doc. 200 at 56), between SCA and any other the other entities. This factor weighs in favor of the Defendants.

### 3.   Centralized Control of Labor Operations

Under this factor, courts look to supervisory authority and the power to control employees' work schedules. *See Hukill*, 192 F.3d at 444; *Cruz-Lovo*, 298 F. Supp. 2d at 1254. One company's use of another HR services is not sufficient to satisfy this factor. *Cruz-Lovo*, 298 F. Supp. 2d at 1254.

---

accounting records; (2) combined bank accounts; (3) combined lines of credit; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices. *Walker v. Boys & Girls Club of Am.*, 38 F. Supp. 2d 1326 (M.D. Ala. 1999). Plaintiffs offer no evidence as to these factors.

Plaintiffs point to the manner in which Defendants responded to Plaintiffs' initial complaints about Dr. Johnson to establish the integrated nature of Defendants' control of labor relations. (Doc. 200 at 57). Plaintiffs point to no evidence that SCC, LLC; SCC, Inc.; or COPS had actual and active control of day-to-day labor practices, which is needed to show centralized control of labor relations. *Fike*, 514 F. Supp. at 727. Plaintiffs point to no evidence that any entity other than SCA exercised day-to-day control over Plaintiffs; set their work hours or schedules, dictated their daily activities, supervised their work, or disciplined them. *See Varner v. Video Indus. Servs., Inc.*, No. 2:10-cv-2737-JHH (N.D. Ala. Apr. 2, 2012) (setting out relevant factors).

As to Plaintiffs' argument about Defendants' handling of their complaints, the allegation SCA reported the results of the investigation to SCC, LLC, which in turn, "decided on a course of action against Johnson," (doc. 200 at 57), is misleading. SCC, LLC's relationship with Dr. Johnson was pursuant to a contract between SCC, LLC and Kevin G. Johnson, M.D., P.C. Any action SCC, LLC took with regard to Dr. Johnson does not show centralized control of labor relations. Plaintiffs point to no evidence SCC, LLC made decisions regarding the Plaintiffs or took action regarding the Plaintiffs. Furthermore, Plaintiffs offer no support for their assertion that Dr. Windham being informed of Plaintiffs' complaints or SCC, LLC taking action with regard to Dr. Johnson constitutes substantial evidence of a centralized control of labor relations.

Plaintiff's assertion that Dr. Johnson would override the decisions of the nurse manager with regard to the schedule of nurses, (doc. 200 at 56; doc. 180 at ¶749), is not supported by the record evidence cited.

Plaintiffs make no reference to SCC, Inc. in their argument, and there is no evidence SCC, Inc. had such authority or control, and this factor weighs in its favor. As to SCC, LLC,

and COPS, this factor also weighs in their favor.  Plaintiffs have presented little to no evidence of centralized control of labor operations.

### 4.   Degree of Common Ownership/Financial Control

Under this factor, courts look to who owns the companies.  *See Hukill*, 192 F.3d at 444; *Cruz-Lovo*, 298 F. Supp. 2d at 1254.  Courts may also look to whether "the business enterprise was splintered into separate corporations . . . ."  *Papa v. Katy Indus.*, 166 F.3d 937, 942 (7th Cir. 1999).

SCC, LLC is owned by two members, COPS and SCC, Inc.  SCC, Inc. is wholly-owned by SCA, and COPS is owned by member physicians.  Although the business enterprise appears "splintered," (i.e., different organizations providing different functions), there is little to no overlap in ownership.  Additionally, as Defendants point out, without more indicia of control, parents and their subsidiaries should not be deemed integrated enterprises.  *See Lusk v. Foxmeyer Health Corp.*, 129 F. 3d 773, 778 (5th Cir. 1997).   SCA (the undisputed employer) does not have any common ownership with any of the other entities.

Furthermore, Plaintiffs cite no evidence that SCC, LLC; SCC, Inc.; or COPS exerted any financial control over one another.  There's no evidence that the entities borrowed funds from each other, shared a single operating budget, or comingled profits or operating expenses.  *Walker*, 38 F. Supp. 2d at 1335 (finding no control when each company had separate budgets and payroll); *Fike*, 514 F. Supp. 2d at 727-28 (finding no financial control when, *inter alia*, there was no evidence of debts or liens between the two entities).  Plaintiffs' argument that SCC, LLC contracted with SCA to provide financial data services, (docs. 200 at 57-58), is not evidence that SCA controls the other entities' finances.   This factor cuts in Defendants' favor.

In sum, all factors cut in Defendants' favor, except factor 1 (common management),

which cuts slightly in Plaintiffs' favor as to Defendants SCC, LLC and COPS only.  The vast majority of the relationship between SCA and SCC, LLC is based on the services contract between the two entities, which is insufficient to establish integration.  *See Cruz-Lovo*, 298 F. Supp. 2d at 1252-55.  Plaintiffs have not presented sufficient evidence from which a jury could conclude the defendants were a single, integrated employer.  However, unlike most cases where this doctrine is applied, one of the defendants (here, SCA) does not dispute it is Plaintiffs' employer for purposes of Title VII.

Plaintiffs' "Loaned Servant" argument, (doc. 200 at 58-60), is also unpersuasive. Plaintiffs cite no Eleventh Circuit authority applying this doctrine to create an employment relationship under Title VII, and provide no authority to support applying this common-law doctrine to their Title VII claims to impose liability on any of the corporate defendants other than SCA.

### b.  Dr. Johnson

Plaintiffs argue Dr. Johnson, as "manager and owner of Defendants," is subject to Title VII liability because he is part of an "integrated enterprise," is an "alter ego," or alternatively an "agent," of the employer. (Doc. 111 at ¶85 n.1 & doc. 202 at 9-10).  As explained above, there is insufficient evidence of a single, integrated enterprise to present this question to a jury.

Furthermore, there is no basis for Plaintiffs' distinction that Dr. Johnson is not being sued in his individual capacity, but in his "capacity as manager and part owner of Defendants."  Title VII does not permit a plaintiff to assert claims against an individual, even if those individuals are owners or managers of the employer.  *Dehaan v. Urology Ctr. of Columbus, LLC*, No. 4:12-cv-06, 2012 WL 1300554, *5 (M.D. Ga. Apr. 16, 2012) (citing *Dearth*, 441 F.3d 931)).  Plaintiffs cite no authority where Title VII is applicable to individuals under these theories; rather,

Plaintiffs rely on "other areas of law." (*Id.*).  These arguments contradict well-settled Title VII legal authority.  *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991).  Title VII's "integrated enterprise" theory was devised to cover integrated *enterprises* – that is, companies that share sufficient managerial and other administrative functions in order to act as one "employer" and to meet Title VII's requirement that an employer have fifteen or more employees.  *See McKenzie*, 834 F.2d at 933.  Plaintiffs offer no support to supplant Title VII's long-standing non-application to individuals.

To the contrary, the Eleventh Circuit has explained "there is nothing in Title VII to support [the] claim that individual capacity liability can be imposed on the basis of the alter ego doctrine."  *Dearth*, 441 F.3dc at 934.  And, there is no evidence Dr. Johnson was an "agent" of Plaintiff's employer (SCA) at any time.  Dr. Johnson was a representative of Kevin G. Johnson, M.D., P.C., which, through agreements with SCC, LLC, provided anesthesia and medical director services.  The agreement specifically provided that there was no agency relationship and that the Contractor had no authority to act on behalf of or bind SCC, LLC or any of its affiliates.

Finally, Plaintiffs' argument that Dr. Johnson and the other entities are necessary parties under Rule 19, (doc. 200 at 61), is without merit.  Plaintiffs have resigned and have not worked with Dr. Johnson for over three years.  The Title VII relief requested from SCA does not require Dr. Johnson or any other entity to be a party to this action.

Accordingly, SCC, LLC; SCC, Inc.; COPS, and Dr. Johnson are entitled to summary judgment on counts 1, 2, and 3 because they were not Plaintiffs' "employer" for purposes of liability under Title VII.

### 2. State Law Tort Claims: Vicarious Liability

To prevail on their state law claims, Plaintiffs must establish a legal basis to hold each

corporate defendant liable for Dr. Johnson's conduct.

### a. Agency Relationship

Plaintiffs first argue the corporate defendants are vicariously liable for Dr. Johnson's allegedly tortious conduct because he was acting as their agent. (*See* doc. 200 at 82-90).

"The test for agency is whether the alleged principal has retained a right of control of the alleged agent." *Ex parte Wild West Social Club, Inc.*, 806 So. 2d 1235, 1241 (Ala. 2001) (citation omitted). Thus, the corporate defendants may not be held liable under a *respondeat superior* theory for Dr. Johnson's conduct unless Dr. Johnson was an "agent" or "employee" of the corporate defendants. "It is a well-settled rule that a principal is not ordinarily liable for the torts of its independent contractor." *Id.* Additionally, even if there is an agency relationship, a principal can only be held liable for a tort committed by its agent if the agent commits the tort while working within the line and scope of his employment. *Id.* at 1241-42 (citing *Latham v. Redding*, 628 So. 2d 490, 495 (Ala. 1993)).

### SCC, LLC

The primary piece of evidence Plaintiffs offer to support an agency relationship is the Medical Director and Anesthesia Services contracts between SCC, LLC and Kevin G. Johnson, M.D., P.C. Even assuming SCC, LLC contracted with Dr. Johnson, the individual, as opposed to the Kevin G. Johnson, M.D., P.C., Plaintiffs cite no evidence that SCC, LLC or any other of the corporate defendants had the right to control the manner in which Dr. Johnson carried out his obligations under the agreement to give rise to an agency relationship. Although Plaintiffs point to aspects of the agreements by which Dr. Johnson provided guidance to SCC, LLC, they fail to identify any aspect of the contractual relationship giving SCC, LLC (or any other corporate defendant) the right to control Dr. Johnson's conduct. The requirement Dr. Johnson comply with

Standards of Business Conduct and associated training does not result in the right to control the means by which Kevin G. Johnson, M.D., P.C. or Dr. Johnson fulfilled its obligations under the contracts.  Although not determinative, § 10 of the agreements expressly establish independent contractor status between Kevin G. Johnson, M.D., P.C. and SCC, LLC.

Plaintiffs cite two main cases in support of their agency theory.  First, in *Briggins v. Shelby Medical Center*, 585 So. 2d 912 (Ala. 1991), the defendant hospital had contracted with the alleged tortfeasor's employer for anesthesiology services, and through that contract the alleged tortfeasor's conduct in performing anesthesia services was subject to regulation by the defendant hospital via "detailed guidelines as to the procedures and practices of the 'Department of Anesthesia,' of which [the alleged tortfeasor] was a member."  585 So. 2d at 915.  No such evidence exists in this case.  There were two contracts between SCC, LLC and Kevin G. Johnson, M.D., P.C., but there is no evidence SCC, LLC provided "detailed guidelines as to the procedures and practices" Dr. Johnson was to perform or other evidence of the right of control.

Additionally, Plaintiffs rely on *Stewart v. Bay Minette Infirmary*, 501 So. 2d 441, 443-44 (Ala. 1986), in which the doctor who was the purported agent of the defendant hospital was given full staff privileges by the defendant hospital; at various times had held offices at the defendant hospital; and the hospital billed patients for the doctor's services.  Although some of the facts from *Stewart* are similar to those in the present case, there is simply no evidence SCC, LLC retained the right to control as to Dr. Johnson.  However, even assuming Dr. Johnson acted as an agent of SCC, LCC the alleged torts were not within the line and scope of his work and were not ratified by SCC, LLC.

In addition to demonstrating the existence of an agency relationship, Plaintiffs must present evidence that (1) the wrongful acts were committed in the line and scope of Dr.

Johnson's work; (2) the acts were committed in furtherance of the business;[11] or (3) the principal participated in, authorized, or ratified the wrongful acts. *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995). Plaintiffs assert tort claims for invasion of privacy, assault and battery, and intentional infliction of emotional distress based on the doctrine of respondent superior. The allegations underlying these claims are of the nature of sexual harassment.

Sexual conduct by an employee is purely personal and outside the line and scope of his employment. *E. Ala. Behavioral Medicine, P.C. v. Chancey*, 883 So. 2d 162, 169 (Ala. 2003); *see e.g., Sparks v. Regional Medical Ctr. Bd..* 792 F. Supp. 735, 748 (N.D. Ala. 1992) (concluding that even if a doctor were an employee of the hospital rather than an independent contractor, the doctor "was not acting with the line and scope of his employment when he allegedly sexually harassed Plaintiff and submitted her to unwanted touching. Such conduct was clearly not within the scope of his employment and was motivated for reasons wholly personal to [the doctor]."). Plaintiffs' citation to the Restatement (Second) of Agency for a purported exception to this rule is not persuasive because this exception has been rejected by the Restatement (Third) of Agency, which the cited case, *Vance v. Ball State Univ.*, -- U.S. -- , 133 S. Ct. 2434, 2241 n.2 (2013), expressly recognizes. Plaintiffs do not otherwise dispute established Alabama law, and their "line and scope" argument must fail.

Plaintiffs' ratification argument has a similar fate. To establish ratification, the plaintiffs must show that SCC, LLC

> (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee[;] (2) that based upon this knowledge, the employer knew or should have known, that such conduct constituted a tort; [sic] and (3) that the employer failed to take adequate steps to remedy the situation.

---

[11] Plaintiffs do not allege or argue this theory.

*Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1437 (M.D. Ala. 1998). Assuming an agency relationship existed, SCC, LLC must have been aware of the specific tort directed at the Plaintiffs to ratify Dr. Johnson's conduct.  Plaintiffs cannot establish ratification by merely showing SCC, LLC was generally aware of allegedly inappropriate conduct directed at anyone other than the plaintiffs.

Plaintiffs rely solely upon an assertion that SCC, LLC had knowledge "because female employees had been complaining about him and the physician owners were warned about him before [Dr.] Johnson was hired."  (*See* doc. 200 at 89).  However, complaints by others about conducted directed at others are insufficient to establish the requisite notification under Alabama law.  *See Moman v. Gregerson's Foods, Inc.*, 570 So. 2d 1215, 1216 (Ala. 1990).  Without evidence the employer had actual knowledge of the alleged tortious conduct, ratification is legally impossible.

### Other Entity Defendants

As to the other corporate defendants, there is simply no evidence of an agency relationship.  Plaintiffs do not even mention SCC, Inc. in their agency argument.  (*See* doc. 200 at 82-86).  Furthermore, Plaintiffs offer no evidence Dr. Johnson was an agent or employee of COPS, as Dr. Johnson's ownership interest in COPS does not itself create an agency relationship.  Likewise, there is no contractual relationship between SCA and Dr. Johnson (or Kevin G. Johnson, M.D., P.C.).   Dr. Johnson's attendance at holiday parties and participation in a bowling team with SCA employees who worked at the SCC, LLC facility, (doc. 140-2 at 26 (227:3-15)), is not evidence that SCA or SCC, LLC (or any other of the corporate defendants) had a right to control the means by which he performed his duties under the Agreements with SCC, LLC.

### b.  Apparent Authority or Purported Agency

Alternatively, Plaintiffs argue the corporate defendants may be held liable for Dr. Johnson's alleged tortious conduct because he held himself out as their agent under an "apparent authority" theory.  (*See* doc. 200 at 86-90).  In this context, "the 'authority' must be 'apparent' to the complaining party and that party must have relied on the appearance of authority; [s]he cannot rely on an appearance of authority [s]he was ignorant of."  *Rosser v. AAMCO Transmissions, Inc.*, 923 So. 2d 294, 301 (Ala. 2005) (quoting *Watson v. Auto-Owners, Ins. Co.*, 599 So. 2d 1133, 1136 (Ala. 1992)).

In support of their argument for apparent authority, Plaintiffs point to four statements SCA employees allegedly made to Anderson.[12]  Lackey fails to identify any statements or representations made to her, and, therefore, she has no basis to assert the doctrine of apparent authority.  Assuming the statements made to Anderson demonstrate some apparent authority, Plaintiffs fail to offer any evidence of (or even allege) Anderson relied to her prejudice or detriment on the alleged understanding that Dr. Johnson was an agent of one of the corporate defendants. *See Kennedy v. Western Sizzlin Corp.*, 857 So. 2d 71, 78 n.3 (Ala. 2003) (affirming summary judgment against parties alleging apparent authority and noting that the plaintiff did not allege or present any evidence of detrimental reliance).  As such, there is no basis for an apparent authority theory.

With no underlying tort claims asserted against the corporate defendants, Plaintiffs

---

[12] These statements include that Johnson "owns the place," (Doc. 178-3 at ¶58); "Dr. Johnson owns the facility and as Medical Director he can do anything he wants," (*id.* at ¶61); "I can't do anything with Dr. Johnson, he owns the place," (*id.* at ¶82); and Johnson "owned the place," "you know if Dr. Johnson doesn't endorse you then you're out," and that Crook also "explained that every decision had to be cleared through Johnson as Medical Director."  (*Id.* at 138).

cannot maintain a claim for wanton/negligent hiring, etc. *Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) (citing *Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003)).  These claims are due to be dismissed.

### III. MERITS: Title VII Claims[13] and State Law Tort Claims[14] (*See* docs. 121, 123, & 132)

#### A.  Additional Summary Judgment Facts

Anderson was hired by HealthSouth in November 2006 to work at the Surgery Center (SCC, LLC).  (Doc. 140-31 at 14-15 (14:20-15:17)).  In 2007, HealthSouth sold an operating division, which became SCA.  (Doc. 128-8 at ¶3).  As part of the transaction, SCA assumed the management agreement between HealthSouth and SCC, LLC.  (*Id.* at ¶4).  After the acquisition in 2007, Anderson became an employee of SCA.  (*Id.* at ¶¶ 3, 10).

Lackey was hired by SCA on June 4, 2010, to work at the Surgery Center.  (Doc. 145-3 8-9 (32:20-33:1)).  Lackey is a registered nurse.  (Doc. 145-2 at 11 (10:8-10)).  When she first started working for SCA, Lackey worked part-time in the post-anesthesia care unit ("PACU") area.  (*Id.*at 23-24 (22:22-23:4); doc. 145-3 at 1 (25:6-21)).  The PACU, also known as the recovery area, is where patients go following surgery to be monitored prior to discharge.  (Doc. 128-10 at ¶4).

Anderson is a registered nurse who works in the PACU area.  (Doc. 140-31 at 10, 16 (9:5-12, 15:18-21)).

In approximately January 2009, Connie Crook ("Crook") became the Director of Nursing at the Surgery Center.  (Doc. 124-2 at 3 (9:17-10:2)).  Crook was Anderson and Lackey's

---

[13] Finding no basis for single employer/integrated enterprise liability, these claims may only be asserted against SCA as the employer.

[14] Finding no basis for vicarious liability, these claims may only be asserted against Dr. Johnson.

director supervisor.  (*Id.* at 5 (19:11-20:10); doc. 128-10 at ¶5; doc. 145-3 at 17 (41:6-8)).  Crook reported to the Administrator.  (Doc. 128-10 at ¶5).  Lori Bates ("Bates") became the Administrator at the Surgery Center in June 2009.  (*Id.* at ¶2).  Tom Long ("Long") was the Administrator at the Surgery Center prior to Bates.  (Doc. 127-3 at 8 (32:16-21)).

Dr. Johnson provided anesthesia services at the Surgery Center under a contract between his practice, Kevin G. Johnson, M.D., P.C., and SCC, LLC.  (Doc. 128-9 at ¶14).  At the time Anderson and Lackey were hired, Dr. Johnson also acted as the Medical Director at the Surgery Center under the terms of a contract between Kevin G. Johnson, M.D., P.C., and HealthSouth. (Doc. 140-3 at 20-21 (331:23-332:6, 334:22-335:2)).  This contract was later amended so as to be between Kevin G. Johnson, M.D., P.C. and SCC, LLC.  (*Id.*; doc. 128-9 at ¶14).  As Medical Director, Dr. Johnson was responsible for clinical issues at the Surgery Center and making certain patient care was at the highest level.  (Doc. 127-3 at 28 (110:19-111:9); doc. 140-3 at 18 (323:4-10)).  As Medical Director, Dr. Johnson was usually the person highest on the chain-of-command at the Surgery Center on a daily basis.  (*See* doc. 140-42 at 2).

Dr. Johnson did not report to anyone at SCA.[15]  (Doc. 128-8 at ¶ 13; doc. 140-3 at 21 (334:9-17)).  Dr. Johnson was not an employee of SCA and had no official authority in hiring, firing, disciplining, or evaluating SCA employees.  (Doc. 140-3 at 18-19; doc. 140-4 at 15; doc. 127-3 at 24 (437:17-21)).  However, Plaintiffs contend Dr. Johnson held himself out as having the authority to get rid of any employee who went against him and bragged about his influence

---

[15]  Although Plaintiffs dispute this fact, the evidence offered does not support their position. (Doc. 201 at 9, ¶17).  Assuming it is true that SCA investigated Dr. Johnson's conduct in 2010 and 2011, this does not demonstrate Dr. Johnson reported to anyone at SCA.  SCA could gather facts regarding complaints made by its employees without necessitating the conclusion that Dr. Johnson reported to SCA.  Furthermore, Dr. Johnson clarified his testimony that SCA or SCC, LLC could terminate his contract at any time.  His contract was with SCC, LLC, not SCA, and only SCC, LLC could terminate the contract.

causing employees and surgeons to lose their jobs.  (Doc. 201 at 9, ¶18).   In response to Anderson's complaints about Dr. Johnson, Crook told Anderson that Dr. Johnson "owned the place" and would "do whatever he want[ed]."  (Doc. 178-3 at ¶¶58, 82).  Anderson also states that Mason, the Administrator, told her "Dr. Johnson owns the facility and as Medical Director he can do anything he wants."  (*Id.*at ¶61).

Anderson testified that, from the beginning of her employment with SCA, Dr. Johnson engaged in intimidating and harassing behavior towards her.  (Doc. 140-31 at 35-36 (34:20-36:10)).  Anderson testified that Dr. Johnson choked her, kicked her in the leg, pulled her hair, and kissed her.  (Doc. 140-31 at 96, 113, 115, 120-21 (95:4-13, 112:12-14, 114:19-20, 119:22-120:7)).   She also testified that Dr. Johnson wrote a "sex word of the week" on her desk calendar, made threatening comments, and showed a picture of Anderson on her hands and knees to other teammates while making inappropriate comments about Anderson.  (*Id.*at 96-97 (05:14-96:16)).  According to Anderson, all of this conduct occurred prior to 2010.  (*Id.* at 91, 101, 113, 115-16, 123 (90:5-7, 100:2-6, 112:6-7, 114:19-115:6, 122:1-17)).

SCA had a written policy prohibiting sexual harassment.  (Doc. 128-6 at ¶6).  Under the sexual harassment policy, an SCA employee, or "teammate," who believes she is being sexually harassed is directed to report her concerns to her supervisor or manager.  (Doc. 131-1 at 10, 13 (35:16-36:4, 46:21-47:13), ex. 35, 39).  If the complaint involves someone in the employee's direct chain of command, or if for any reason the employee is uncomfortable discussing the matter with her direct supervisor, she should report the matter to SCA's Human Resources Department or any senior member of management.  (*Id.*).  The policy also provides that if an employee believes that her complaint of a possible violation of the policy has not been properly addressed, or if the employee otherwise feels that SCA has not met its obligation under the

27

policy, then the employee should immediately contact the Home Office Human Resources Department. (*Id.*). SCA's sexual harassment policy is included in its Teammate Handbook. (Doc. 128-10 at ¶6). The SCA Teammate Handbook also has a Corporate Compliance Program, including a Compliance Hotline telephone number that is available to teammates who want to report a violation. (*Id.*).

Anderson signed an acknowledgement of receipt for the SCA Teammate Handbook on January 28, 2009. (Doc. 140-31 at 19-20 (18:11-19:5)). Anderson also reviewed policies and procedures in the Surgery Center break room. (*Id.* at 20 (19:6-14)). Lackey also received a copy of the SCA Teammate Handbook within a few days of hire. (Doc. 145-3 at 5-6 (29:18-30:22)).

In February 2010, SCA received four anonymous calls to its compliance hotline concerning a variety of complaints at the Surgery Center, including alleged sexually inappropriate conduct by Dr. Johnson. (Doc. 131-1 at 27-28 (103:6-106:20)). Anderson testified that she made one of the phone calls. (Doc. 140-31 at 91 (90:5-10)). She further testified that, during the call, she complained about Dr. Johnson's alleged sexually harassing and physical conduct towards her. (*Id.* at 96-97 (95:4-96:22)).

After SCA received the anonymous hotline calls, SCA Group Human Resources Manager Lynne Hammack ("Hammack") who worked out of SCA's corporate office in Hoover, Alabama, began an investigation. (Doc. 131-1 at 3, 27 (9:16-22, 102:5-103:7)). Hammack came to the Surgery Center during the investigation into the February 2010 complaints to interview teammates about the subject of the complaints. (Doc. 131 at 31 (119:15-120:2, ex. 31 at 10-31), doc. 124-1 at 23 (91:14-22)). Hammack and SCA Regional Vice-President Coy Wells ("Wells") interviewed Anderson within one to three days after her call to the compliance hotline. (Doc. 140-31 at 105-106 (104:5-105:18)).

Based on her investigation into the 2010 hotline calls, Hammack was able to substantiate some of the complaints about Dr. Johnson.  (Doc. 131-1 at 29, 34 (109:8-12, 129:5-130:3, ex. 30)).  Thereafter, Wells talked with Dr. Johnson about the complaints.  (Doc. 140-3 at 25 (365:12-366:14)).  The extent of these conversations is disputed.

After her anonymous complaint to the compliance hotline, Anderson claims Dr. Johnson stopped writing a "sex word of the week" on her calendar, did not choke her, or pull her hair.  (Doc 140-31 at 141-42 (140:8-16, 141:16-21)).  According to Anderson's deposition testimony, other than hugging, Dr. Johnson touched her only one time after her complaint in February 2010, when he allegedly ran his hand down her arm while handing something to her.  (Doc. 140-31 at 138-138, 141-142).  Additionally, Anderson testified that Dr. Johnson engaged in the following inappropriate conduct after her February 2010 complaint:[16] (a) Dr. Johnson referred to Anderson and Lackey as lesbians and once told them they should "get a room" and on another occasion said "you might as well go ahead and French her," (doc. 140-31 at 144); (b) when Dr. Johnson hugged Anderson, she felt like he was trying to hurt her chest area because of the force that he would use, (*id.* at 145); (c) after Lackey called Dr. Johnson for help catheterizing a male patient, Dr. Johnson teased Lackey by saying things like "no, Kathy, I won't handle anymore dicks for you" and indicated that Anderson "handled dicks better than anyone there," (*id.* at 144-45); (d) Dr. Johnson talked about the "pubic scapes" of a couple of young female patients and said they were sex freaks, (*id.* at 145); (e) Dr. Johnson talked about employees in a negative manner in front of PACU employees, for example, saying Crook "looked like a can of busted biscuits" and

---

[16] As indicated *supra*, the undersigned has not included every allegation of misconduct included in Plaintiffs' combined statement of facts.  Not only was this pleading not contemplated by the scheduling order, it contains mostly irrelevant and inadmissible evidence.  Noteworthy here is the fact that Defendants have not challenged Anderson's sexual harassment claim.  Thus, every single allegation of misconduct is not relevant at this point.

needed to lose weight, (*id.*at 145); (f) Dr. Johnson called Marie Earwood "the biggest slut in

Joppa," (*id.* at 145); and (g) Dr. Johnson joked with Crook about having caught "Marie Earwood

for sniffing crack," (*id.*at 145-46).

On January 19, 2011, Anderson and Lackey, along with two other RN teammates, went

to Administrator Lori Bates' office to complain about Dr. Johnson.   (Doc. 140-31 at 134

(133:208)).  This was a little over seven months after Lackey began working at SCA.  (Doc. 145-

3 at 9-10 (33:23-34:5)).  During the meeting, the nurses complained that they believed the

Surgery Center was "bugged" and that there could possibly be cameras there too.   (*Id.* at 17

(41:16-20)).  Lackey believed the Surgery Center was "bugged" because "sometimes you could

be talking to someone in the dressing room in the woman's locker room . . . . [a]nd then later that

day maybe we would be in recovery room or PACU and [Dr.] Johnson would mention something

along the same lines of [what] we had said in there, we felt like."  (*Id.* at 15-16 (39:13-40:7)).

Lackey never found any listening devices at the Surgery Center and never looked for any.  (*Id.* at

16 (40:8-10)).  Bates told the nurses that she would have it checked out.  (Doc. 145-3 at 17-18

(41:16-42:1)).

Anderson, Lackey, and the other nurses also complained to Bates and Crook about an

incident that allegedly occurred several months previously, in October 2010, when Lackey and

another nurse, Belinda Beverly, dressed up in Auburn tiger outfits, and Anderson dressed up like

an Alabama elephant.  (Doc. 145-3 at 13, 20-21 (37:1-10, 44:19-45:2)).  While Lackey, Beverly,

and Anderson dressed up in their tiger and elephant costumes, they posed for several pictures.

(Doc. 145-4 at 5-6 (54:23-33:16)).  In several of the pictures, Anderson is holding Beverly's fake

tiger tail up toward her mouth, imitating mascots fighting.  (*Id.* at 11 (60:1-10); doc. 178-4 at

¶26).  Dr. Johnson took the pictures of Lackey, Anderson, and the other nurses with Lackey's

camera.  (Doc. 145-4 at 7 (56:14-16)).  Lackey was smiling and having fun when the pictures were taken.  (*Id.* at 10 (59:21-23)).

Lackey complained to Bates and Crook in the January 19, 2011 meeting that, while they were dressed in their costumes, Dr. Johnson pulled her fake tiger tail, later clarifying with enough force to pull her pants down exposing her panties, and put his hand on her shoulder.  (Doc. 145-3 at 20-21 (44:19-45:2); doc. 145-4 at 4 (53:4-10); doc. 178-4 at ¶26).  Lackey testified that, prior to Dr. Johnson pulling her fake tail, the only thing she felt was sexual harassment toward her by Dr. Johnson was that he allegedly called her a lesbian.[17]  (Doc. 145-4 at 9:1-20)).

The nurses also complained about Dr. Johnson being unavailable when they called him for orders, making "rude comments" when they called him for physician orders, and attempting to hug and kiss Anderson.  (Doc. 145-3 at 20-21 (44:19-45:2)).

In response to their complaints, Bates asked the nurses what they wanted to happen.  (Doc. 145-3 at 18 (42:2-4)).  They told Bates that they wanted Dr. Johnson to step down as medical director, wanted him to "stop doing what he was doing," and wanted him to communicate with them only about issues that involved their jobs.  (*Id.* (42:5-14)).  Bates also asked the nurses to write out statements describing their concerns.  (*Id.* at 21 (45:15-17)).  In response to the nurses telling her there were others who shared their concerns but were afraid to come forward, Bates told the nurses others who wanted to make reports could submit statements of their complaints anonymously through the plaintiffs.  (*Id.* (45:5-14)).

---

[17] Plaintiffs "deny" this fact and cite numerous paragraphs from Lackey's declaration, which contradict her prior sworn deposition testimony.    Under the sham affidavit doctrine, a party opposing summary judgment may not, without explanation, rely on a statement that is inconsistent with prior worn testimony to defeat a motion for summary judgment.  *Van T. Junkins & Asscos. v. U.S. Indus.*, 736 F.2d 656, 656 (11th Cir. 1984).

Following the January 19, 2011 meeting with Bates and Crooks, Lackey prepared a written statement describing her complaints against Dr. Johnson.  (Doc. 145-3 at 22-24 (46:20-48:18, ex. 3)).  In her written statement, Lackey indicated that Dr. Johnson had glared at her or given her a mean look on numerous occasions, required her and other nurses to call him for orders even though they had "standing orders" in PACU, and responded by saying things like "so," "fix it," or "What do you want me to do about it" when she called him for orders.  (*See id.*).  Lackey also indicated that when Dr. Johnson pulled her fake tiger tail in October 2010, he commented "I didn't want to leave today without getting any tail."  (*Id.*).  Finally, Lackey said in her statement that she had witnessed Dr. Johnson sexually harass Anderson by making comments like "she is crazy" and "she is off her medication," leaning over Anderson, hugging her, writing on Anderson's desk calendar even though Anderson asked him not to, and blowing kisses to Anderson.  (*Id.*).

Lackey's written statement was dated January 25, 2011, six days after her meeting with Bates.  (Doc. 145-3 at 24 (48:3-18)).  It was Lackey's intent to include all of her complaints in the statement she prepared at Bates' request.  (Doc. 145-4 at 2 (51:2-21)).

The morning after receiving these complaints, Bates brought Dr. Johnson into her office along with Crook.[18]  (Doc. 127-3 at 63 (249:13-250:7)).  Bates explained to Dr. Johnson the seriousness of the allegations and asked him to stop if he was doing any of the things about which she had received complaints.[19]  (*Id.* at 62-63 (247:1-5, 250:3-7)).  Bates told Dr. Johnson

---

[18]  Although Plaintiffs "deny" this fact, their explanation and supporting evidence reference events following the 2010 complaints, not the 2011 complaints, and are therefore irrelevant.

[19]  Although Plaintiffs "deny" this fact, their explanation and supporting evidence reference events following the 2010 complaints, not the 2011 complaints, and are therefore irrelevant.

the only contact he should have with teammates would be anesthesia directions, and that if the nurses called him, he needed to make sure he responded.  (*Id.* at 63, 64 (251:3-10, 254:21-255:12)).  Bates also reported the nurses' concerns to SCA Regional Vice President Tom Gill ("Gill") and to Dr. Greg Windham, surgeon and board member at SCC, LLC.  (*Id.* at 62, 64-65 (247:11-16, 256:10-257:6; doc. 127-4 at 6 (463:7-19)).  Gill, who was located in North Carolina, came to the Surgery Center and, along with Bates and Dr. Windham, met with Anderson, Lackey, and the other two nurses on Monday, January 24, 2011, to discuss their complaints. (Doc. 127-3 at 67, 68-69 (266:3-10, 272:21-273:12; doc. 127-4 at 7 (468:14-469:4)).

The complaints were also reported to Lynne Hammack ("Hammack").  (Doc. 127-3 at 35, 67 (138:9-139:12, 265:19-266:2).  Upon learning of the January 19, 2011 complaints about Dr. Johnson, Hammack began another investigation.  (Doc. 131-1 at 53).  Hammack came to the Surgery Center in January and February 2011 to conduct interviews of SCA teammates.  (*Id.* at 54-55 (210:9-212:2, 215:8-216:1).  Hammack spoke with Anderson, Lackey, and the other complaining nurses, as well as some other SCA teammates.  (*Id.*, ex. 12).

Anderson also spoke to SCA Regional Vice President Tom Gill, both in person and on the telephone, during the investigation.  (Doc. 140-31 at 137-38, 146 (136:23-137:3, 145:10-19)). Gill asked Anderson if she was willing to work with Dr. Johnson, or if she refused to work with him.  (*Id.* at 151 (150:1-3)).  Anderson told Gill that she would not refuse, but was not willing to be left alone with Dr. Johnson.  (*Id.*).  Anderson was never left alone with Dr. Johnson after her January 19, 2011 complaint.  (Doc. 140-31 at 151 (150:21-23)).

Following SCA's investigation into the complaints about Dr. Johnson, Tom Gill, Lori Bates, SCA's general counsel Rich Sharff, and some members of the Medical Executive Committee ("MEC") of SCC, LLC met to discuss the next steps regarding Dr. Johnson.  (Doc.

173-3 at 96 (381:10-382:6); doc. 124-5 at 42, 43 (168:10-23, 169:14-170:19, 172:2-7)).  As a result of this meeting, the medical director services agreement between SCC, LLC and Kevin G. Johnson, M.D., P.C. was terminated, and Dr. Johnson "voluntarily agreed to" self-report to the Alabama Physicians Health Program during an eight-week leave of absence from the Surgery Center beginning on March 3, 2011.  (Doc. 128-5 at ¶¶32, 37; doc 140-51 at 1).

On March 2, 2011,[20] Dr. Bill Smith began providing medical director services for SCC, LLC.  (Doc. 140-51 at 1-2).

At her deposition, Anderson testified that she did not recall Dr. Johnson doing anything that she felt was "sexually offensive" after her 2011 complaint.[21]  (Doc. 140-31 at 152 (151:1-5)).

In May 2011, Dr. Johnson returned from his leave of absence and resumed performing anesthesia services at the Surgery Center.  (Doc. 1727-3 at 100 (400:8:14)).  Prior to Dr. Johnson's return, Bates had a telephone conversation with Robert Thornhill, the director of the Alabama Physician Health Program. (Doc. 127-4 at 11 (484:1-14)).  Thornhill communicated to

---

[20] Plaintiffs' dispute to this date, (*see e.g.,* doc. 201 at ¶63), is not supported by the record.

[21] Specifically, Plaintiffs "admit" that "[a]fter Anderson's complaint to Lori Bates [on] January 19, 2011, [Dr.] Johnson did not engage in any conduct that Anderson considered to be sexual harassment."  (*See* doc. 137 at ¶64 *and* doc. 201 at ¶64).  However, they "deny any inference that [Dr.] Johnson did not engage in other inappropriate conduct following the 2011 investigation, including retaliating against Anderson.  Anderson testified about ongoing sexual harassment and retaliation but did not specify dates nor was she asked by SCA to do so."  (Doc. 201 at ¶64).  This response contains no citation to the record.  Both the appendix to the original scheduling order, (doc. 18 at 7-8), and the undersigned's initial order, (doc. 160-2 at 3-4), require a party opposing summary judgment to include a specific reference to the evidentiary record upon which a factual dispute is based and states that material facts set forth in the movant's statement of facts will be deemed admitted for purposes of summary judgment unless controverted in this manner.  As discussed *supra*, the undersigned has included those facts from Plaintiffs' combined statement of undisputed facts, (doc. 180), upon which Plaintiffs specifically rely after reviewing Defendants' objection thereto, if any.

Bates that Dr. Johnson had followed through with the recommendations of the program and was ready to return to the Surgery Center. (*Id.* (484:1-485:15)). Dr. Smith continued to provide medical director services after Dr. Johnson returned. (Doc. 124-5 at 74 (296:1-297:5; doc. 128-4 at 5 (20:14-19)).

Anderson contends she was retaliated against following her complaints about Dr. Johnson. Specifically, Anderson claims that, after her January 2011 complaint, among other things, she was assigned extra job duties. (Doc. 140-31 at 183 (182:7-14)). Anderson was assigned to be the safety officer (also referred to as the maintenance supervisor) at the Surgery Center following Kari Walker's resignation in March 2011. (*Id.*at 22, 23, 24-25 (21:20-22, 22:18-22, 23:16-24:5)). Although Crook testified that she assigned Anderson the safety officer duties because she did not have extra duties while others did and not because of her complaints, (doc. 124-2 at 117 (466:12-23), Anderson contends she already had extra duties and had been performing duties previously assigned to former teammates Roger Lee and Amy Shelton, (doc. 178-3 at ¶¶265-67).

As safety officer, Anderson was responsible for performing weekly checks on the generator that functioned as an emergency power source for the Surgery Center. (Doc. 140-31 at 27, 29 (26:4-10, 28:3-6)). The generator is the size of an eight-by-ten room, requiring her to climb a six foot ladder to check oil and fluid levels using a dip stick. (Doc. 178-3 at ¶¶260, 268, 270). Anderson was also responsible for all emergency drills, checking all fire extinguishers, and exit signs. (*Id.*). Anderson was required to record her generator function checks each week on a log. (Doc. 140-31 at 30-32 (29:17-31:7)). Anderson estimates that her duties with respect to checking the generator took approximately fifty minutes each week. (*Id.* at 32-33 (31:8-32:11)).

Anderson states that, following her 2011 complaint, she was contacted by the Alabama Board of Nursing because of inquiries into her license.   (Doc. 130-31 at 184 (183:6-17)). Anderson testified that the Surgery Center had made inquiries into her license, but does not know who at the Surgery Center allegedly did so.   (*Id.* (183:11-15)).   Anderson claims she was retaliated against when she was made to fill out a new employment application, even though she had worked at the Surgery Center for years.   (*Id.* (183:15-17)).   Bates states that Anderson was asked to fill out a new employment application because an audit of personnel files conducted in preparation for inspection by SCA's accrediting agency revealed that it did not contain an employment application.[22]   (Doc. 128-10 at ¶7).   SCA is required by its accrediting agency, the Accreditation Association of Ambulatory Healthcare ("AAAHC"), to maintain an employment application in all teammate files.   (*Id.*).

In December 2011, Anderson was called into Bates' office and questioned by Bates and Tom Gill regarding what they believed was inaccurate and incomplete documentation of generator logs.   (Doc. 140-31 at 162-63, 165 (161:21-162:21, 164:10)).   Anderson disputes that their accusation was accurate.   (Doc. 178-3 at ¶297).   Gill made it clear to Anderson that checking the generator was extremely important, as it provided emergency power that could be needed during surgeries.   (Doc. 124-5 at 65-66 (257:18-258:20, 261:10-262:3, 262:23-263:6)).

In December 2011, Bates presented Anderson with a written warning for inaccurate documentation of the generator logs.   (Doc. 140-31 at 157-58, 164, 166-67 (156:23-157:10, 163:2-12, 165:17-166:6)).   Anderson did not agree with the discipline form and refused to sign it. (*Id.* at 160-62 (159:12-161:7)).   Anderson contends she was provided with a different form later,

---

[22] Although Plaintiffs "deny" the reason stated, they offer no evidence to dispute this fact. (*See* doc. 201 at ¶79).

which she ultimately signed on January 4, 2012.  (*Id.* at 160, 162, 167-68 (159:12-15, 161:2-7,

166:8-167:7)).  Anderson understood that Gill and Bates believed that she had documented the

generator logs inaccurately.  (*Id.* at 164 (163:2-5)).   Anderson's position is that the information

she documented in the logs was accurate.  (*Id.* (163:6-13)).   Anderson was very insulted,

humiliated, and intimidated by being accused of inaccurate documentation of generator logs.

(*Id.*at 169 (168:5-9)).

Anderson states that, at the end of 2011, she told Gill and Bates that she could no longer

work around Dr. Johnson, that she felt he was a threat to her life and nursing license, and that she

could barely function when he was in the workplace.  (Doc. 178-3 at ¶298).

Anderson claims that following her initial meeting with Gill and Bates about the

generator logs in December 2011, the atmosphere at the Surgery Center changed.  (Doc. 140-31

at 172-74 (171:9-173:19)).   Anderson claims that the way other employees, including those she

worked for, acted towards her changed in December 2011, and she "could not take anymore."

(*Id.* at 174 (173:4-16)).  Anderson testified that she does not know what caused the change in the

way employees acted towards her in December 2011. (*Id.* (174:17-19)).

As a result of her extreme anxiety and depression, Anderson took an FMLA leave of

absence in January 2012 and eventually resigned her employment in March 2012, without having

returned from FMLA leave.  (Doc. 178-3 at ¶298; doc. 140-31 at 157 (156:12-20)).

Lackey claims that, following her complaint about Dr. Johnson, she was subjected to

retaliation.  (Doc. 145-5 at 19 (93:15-21)).  Specifically, Lackey claims SCA retaliated against

her by enforcing its existing policies prohibiting teammates working in clinical roles from

wearing nail polish and from having drinks at the PACU desk.[23]  (*Id.* at 20-21 (94:6-96:6)).  The policies prohibiting teammates working in clinical roles from wearing nail polish and dangling jewelry, and from having drinks at the desk were existing policies that SCA had become somewhat lax about enforcing.  (Doc. 124-2 at 39-40 (156:10-158:13, 159:3-160-9)).  SCA began enforcing those policies in early 2011 after Clinical Director Leanne Blackwell visited the Surgery Center to help get ready for inspections required for state and AAA accreditation.  (*Id.*).  Although not strictly enforced before, Lackey acknowledges that the policy prohibiting nail polish has a medical basis.  (Doc. 145-5 at 21 (95:4-9)).  Lackey was never disciplined for violating either of these policies, but nonetheless claims that their enforcement was retaliation against her because she felt that other employees blamed her and the other complaining nurses for their enforcement.  (*Id.* at 20 (94:1-20)).

Lackey also claims that Dr. Johnson retaliated against her by ordering pain medication be administered to a fifteen-year-old patient by injection, or intramuscularly, rather than via her IV.  (Doc. 145-5 at 21-23 (95:18-97:2)).  Lackey acknowledges that there are medical indications for giving medications via injection instead of by IV, such as that "one may last longer than the other," and that this may have been Dr. Johnson's rationale in having the medication be administered by injection.  (*Id.* at 23-24 (97:7-98:1)).

Lackey also claims she was retaliated against by Dr. Johnson because, following her complaint, Dr. Johnson made sure that his nurse, Beth Pitmon,[24] was with him whenever he

---

[23] The portions of Lackey's declaration stating other instances of retaliation, (doc. 178-9 at ¶49-53), contradict her prior sworn testimony.  These instances include feeling alienated by co-workers, particularly hearing Pitmon spread rumors that they were out to get money; Dr. Johnson glaring at her; and feeling afraid Dr. Johnson would treat her like he treated Anderson/fearing for her safety.  (*Id.*).

[24] Dr. Johnson employed an RN and three Certified Registered Nurse Anesthetists

came back to the PACU.  (Doc. doc. 145-5 at 17-18 (91:22-92:16)).  Lackey felt that this suggested Dr. Johnson "[k]ind of felt like he needed a witness everywhere he went."  (Doc. 145-5 at 17-18 (91:22-92:16)).  Additionally, Lackey felt like the Certified Registered Nurse Anesthetists ("CRNAs") Dr. Johnson employed became "standoffish" after her complaint and felt that "the whole environment felt different."  (*Id.* at 17-18, 20, 25 (91:22-93:16, 94:1-20; 99:16-22)).

On February 25, 2011, Lackey informed Crook that she planned to resign.  (Doc. 145-5 at 24-25 (98:11-99:9)).  Crook tried to talk Lackey into staying.  (Doc. 124-2 at 96 (383:12-20)).  Bates and Gill talked to Lackey on February 28, 2011, and tried to convince her not to resign.  (Doc. 127-3 at 93 (372:8-11)).  Lackey nonetheless resigned, effective March 22, 2011.  (Doc. 145-5 at 25 (99:10-12)).

In her March 11, 2011 resignation letter, in which she referenced her February 25, 2011 verbal notice to Crook, Lackey indicated that she felt that there was still a hostile environment at SCA.  (Doc. 145-5 at 24-25 (98:23-99:22)).  In saying this, Lackey testified that she did not mean there was any ongoing sexual harassment, (*id.* at 25-26 (99:23-100:2)), but that she was referencing the attitudes of Dr. Johnson's CRNAs and other employees, and Dr. Johnson wanting to have a witness with him when in the PACU, (*id.* at 26 (100:3-5)).  Dr. Johnson was on a leave of absence when Lackey resigned.  (Doc. 145-5 at 25 (99:13-15)).

Anderson filed her initial charge of discrimination with the EEOC on February 24, 2011.  (Doc. 140-31 at 174-75 (173:23-174:13, ex. 10)).  Anderson testified that, during the

---

("CRNAs") to assist him.  (Doc. 130-1 at 112 (448:1-7).  Dr. Johnson hired Pitmon to work as his RN in or around September 2010.  (Doc. 124-5 at 4 (15:14-17)).  Prior to that time, Pitmon had worked as an RN for SCA since 2006.  (*Id.* at 3 (9:5-14)).  After going to work for Dr. Johnson, Pitmon continued to work as a PRN, or "part-time" as needed, for SCA.  (*Id.* at (10:11-11:7)).

investigation of her EEOC charge, she told the investigator that she had "feelings" for Dr. Johnson, (*id.*at 278 (277:16-278:6)), but later clarified (through her declaration) that she said everyone at the Surgery Center had at least occasional feelings of sympathy and friendship about Dr. Johnson because he was manipulative, (doc. 178-3 at ¶276).

Anderson filed an amended EEOC charge on or about January 3, 2012.  (Doc. 140-31 at 175-76 (174:17-175:23, ex. 11)).

On February 21, 2012, Anderson, Lackey, and two other nurses filed the complaint in this case.  (Doc. 1).  They amended the complaint on November 16, 2012. (Doc. 22).

The night before her April 16, 2013 deposition, more than two years after her initial complaint about Dr. Johnson and subsequent resignation, Lackey prepared a list of items that she claims constituted sexual harassment.  (Doc. 145-4 at 2-3, 5 (51:22-52:16; 54:3-14)).  This list contained a number of items not included in the statement Lackey had provided Bates during her employment, at the time of her complaint about Dr. Johnson.  (*Id.* at 3-5, 17-18 (52:17-54:22, 66:2-67:20)).  Specifically, Lackey indicated on the list she prepared the night before her deposition that at the time Dr. Johnson pulled her fake tiger tail, he put his hand on her shoulder and said "I didn't want to leave today without saying I got a little tail from Kathy Lackey."  (*Id.* at 3-4 (52:17-53:16)).  Lackey also described an incident in late October or early November 2010, when she called Dr. Johnson for help after she was unable to catheterize a male patient.  (*Id.* at 20-22 (69:7-71:17)).  Dr. Johnson catheterized the patient, then teased her for a couple of weeks afterwards by saying things like "no, Kathy, I won't be handling any more dicks for you today, you can handle your own dicks" and "you can get some advice from Dana [Anderson] because she is good at handling dicks."  (*Id.*).

Additionally, Lackey included that Dr. Johnson called her "baby" several times and

several times referred to women as "bitches."  (Doc. 145-4 at 25 (74:20-75:4); doc. 145-5 at 1, 3-4 (74:20-75:4; 77:6-78:2)).  Lackey did not tell Dr. Johnson that she did not want to be called baby.  (Doc. 145-5 at 1 (95:5-7)).  Lackey also claims that she once went into Dr. Johnson's office to get an order and saw an image of a woman in either a bathing suit or lingerie on his computer.  (*Id.* at 1-2 (75:12-76:9)).  Lackey testified she saw Dr. Johnson massage the back of his assistant, Beth Pitmon.  (Doc. 145-5 at 4-5 (78:16-79:10)).  Pitmon had asked Dr. Johnson to rub her shoulders.  (Doc. 124-6 at 14 (55:6-21)).  Lackey also claims Dr. Johnson hugged her, but did not try to kiss her.  (Doc. 145-4 at 23 (72:7-10)).  Lackey consider Dr. Johnson's hug to be inappropriate.  (*Id.* at 23 (72:11-13).  Additionally, Lackey claims that on three or four occasions Dr. Johnson came up behind her when she was sitting at the nurses' desk and leaned over her tapping her on the shoulder to indicate that she should move out of the seat so that he could have it.  (Doc. 145-5 at 8-9 (82:1-83:20)).

Lackey also included various concerns she had about the way that Dr. Johnson behaved towards Anderson.  Specifically, Lackey claims that Dr. Johnson "made" Anderson "beg" for things such as when she wanted keys or help with the drink machine, put his finger in Anderson's drink or food, ate Anderson's food, and called Anderson names such as "butt-face" and "crazy."  (Doc. 145-5 at 5, 6, 7 (79:11-20, 80:12-14, 81:6-18)).

**B.  Analysis**

### 1.  Title VII – Sexual Harassment/Hostile Work Environment

Although Anderson and Lackey assert a hostile work environment claim, SCA does not move for summary judgment on Anderson's claim.  (*See* doc. 137).

To establish a hostile work environment sexual harassment claim under Title VII, a plaintiff must demonstrate: (1) she belongs to a protected group; (2) she has been subject to

unwelcome harassment, (3) the harassment complained of was based on her sex; (4) the harassment was sufficient "severe or pervasive" to alter the terms and conditions of employment and create a discriminatory abusive work environment, and (5) a basis for holding her employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068 (2000) (citing *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)). Defendants do not challenge the first two elements of Lackey's hostile work environment claim, but argue that much of the alleged harassment was not based on sex, the alleged sexual harassment was not severe or pervasive, and there is no basis for holding SCA liable. (Doc. 129 at 23-30).

### a. <u>Harassment Must be Based on Sex/Gender and Must be Severe and Pervasive</u>

To establish a claim for sexual harassment under Title VII, a plaintiff must prove that the alleged harassment was because of her sex. *Henson*, 682 F.2d at 903-05. Actionable harassment "can be of at least two kinds: (1) a threatening, bellicose, demeaning, or offensive conduct . . . because of the sex of the victim of such conduct; or (2) unwelcome sexual advances. . . . [H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Livingston v. Marion Bank & Trust Co.*, 30 F. Supp.3d 1285, 1302 (N.D. Ala. 2014) (citing *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)) (internal quotation marks and citations omitted). Based on the evidence presented, viewed in a light most favorable to Lackey, a reasonable jury could conclude that Dr. Johnson's alleged harassment was based on the sex of his targets, including Lackey, as there is no evidence that Dr. Johnson treated any males in the workplace this way.

However, the alleged sexual harassment must also be sufficiently severe *or* pervasive. Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the

victim's employment" such that an abusive work environment is created.  *Oncale*, 523 U.S. at 81.  Further, only harassing conduct that is severe or pervasive can produce a "constructive alteration in the terms or conditions of employment.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

In evaluating severity and pervasiveness, courts must examine whether the conduct was both subjectively and objectively severe or pervasive enough to alter an employee's terms or conditions of employment.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (*abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).  First, the plaintiff must "subjectively perceive" that the environment is hostile and abusive, and the plaintiff's subjective perception must be objectively reasonable. *Id.* at 21.

As noted *supra* in footnote 17, under the "sham affidavit" doctrine, Lackey cannot rely on "facts" that flatly contradict her prior sworn deposition testimony to avoid summary judgment.  *See Van T. Junkins & Asscos. v. U.S. Indus.*, 736 F.2d 656, 656 (11th Cir. 1984). The evidence establishes that (1) in January 2011, Lackey made a verbal complaint to Bates; (2) she prepared a written statement describing the alleged sexually harassing conduct at the time of her January 2011 complaint; and (3) she made another list of complaints the night before her April 2013 deposition to help her remember everything.  (Doc. 145-3 at 21, 22-24, 25 (45:3-17, 46:20-48:13); doc. 145-4 at 2, 3, 5 (51:14-21, 52:9-16, 54:3-14)).  Near the end of her deposition, Lackey testified that she identified everything she could think of that Dr. Johnson had done wrong to her.  (Doc. 145-10 at 6 (205:20-23)).  Lackey reserved the right to read and sign her deposition transcript, and, did so, noting that no corrections were necessary.  (Doc. 145-2 at 3 (2:8-9)).  However, in response to Defendants' motions for summary judgment, Lackey submitted a response brief, (doc. 200), and declaration, (doc. 178-4), containing much more

egregious allegations of sexual harassment including the following: Dr. Johnson pulling her pants down and exposing her panties, touching her butt, grinding his genitals into her back, viewing pornography at work, accusing her of taking pornographic photographs at work, talking about bestiality, writing a sex word of the week, placing vulgar images on her department calendar, showing her a photograph of Anderson kneeling in front of a male patient, openly discussing female employees' PMS, breasts, nipples, and sex lives as well as erections, suggestively licking his fingers and shoving them in  and out of Anderson's mouth, using threatening language about his guns and committing to seeking revenge on those who complained about him, leering at her body to see what kind of panties she was wearing, giving her sexually suggestive looks, "using a tone of voice that was reflective of a relationship between [Dr.] Johnson and Lack[e]y," writing a "sex word of the week" on the calendar such as "pessary," and an alleged "daily barrage of misogynist comments" such as "bitch," "whore," and "slut."  (*See* doc. 200 at 21-22, 24-27, 30, 32-34, 38-39, 41, 43, 45-46).

Under the "sham affidavit" rule, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984).   Discrepancies that merely create an issue of credibility or go to the weight of the evidence will not support invocation of this doctrine.  *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  To believe that between her April 2013 deposition and her December 2014 brief, Lackey "remembered" these additional and substantially different instances of sexual harassment would require suspension of reality.   The different and additional instances of

44

harassment Lackey offers contradict, without explanation,[25] her prior sworn deposition testimony.  Accordingly, Lackey is not permitted to use the additional "facts" in her declaration that are inconsistent with her prior sworn deposition testimony to create a triable issue.

Even if Lackey subjectively perceived her working environment to be hostile and abusive, this perception was not objectively reasonable.  In evaluating severity or pervasiveness, courts must examine (1) the frequency of the discriminatory conduct; (3) its severity; (3) whether it is physically threatening or humiliating, or merely offensive; and (4) whether it unreasonably interferes with an employee's work performance.  *Harris*, 510 U.S. at 23.

Lackey testified that, prior to the day Dr. Johnson allegedly pulled her fake tiger tail in October 2010, she did not feel that she had been sexually harassed other than Dr. Johnson allegedly calling her a lesbian.  (Doc. 145-4 at 8-9 (57:18-58:20)).  Lackey also testified that there was no sexually harassing conduct after her January 2011 complaint.  (Doc. 145-5 at 17, 25-26 (91:3-17, 99:16-100:2)).  Thus, the alleged harassment occurred over a period of time less than three months and was not pervasive.  *See Lockett v. Choice Hotels Intern., Inc.* 315 Fed. App'x. 862, 866 (11th Cir. 2009) (noting that harassment occurring over a four-month period was not frequent and holding that conduct was insufficiently severe or pervasive to be actionable).

Likewise, the alleged harassment was not severe.  *See e.g., Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1027 (11th Cir. 2008) (gender related comments made on at least weekly basis over eight weeks, including comments that Plaintiff "looked hot," should wear tighter clothing, and that "women who dye their hair have issues at home," along with

---

[25] To the extent Lackey's counsel attempts to offer some explanation that Lackey recently "remembered" these additional inferences, the declaration contains no explanation for the new, different testimony.

telling Plaintiff's husband in her presence that he was "eating your wife" were not severe or pervasive); *see Hockman v. Westward Comms. LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (holding that sexually suggestive comments, slapping the plaintiff on the behind with a newspaper, grabbing or brushing up against the plaintiff's breasts and behind, and attempting to kiss the plaintiff did not qualify as severe); *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261-62 (10th Cir. 1998) (finding comments directed toward one plaintiff about wet dreams, the plaintiff's exposed bra strap, a double entendre about the plaintiff's desk drawers, and a comment about what plaintiff was wearing under her dress, and evidence that the other plaintiff was subjected to four specific acts of unwanted physical conduct, in addition to other touching that occurred periodically, were insufficient to state hostile work environment claims).   Lackey testified that the only alleged touching was Dr. Johnson hugging her "maybe three" times during which he did not attempt to kiss her or touch her in an inappropriate place, and Dr. Johnson's lower abdomen touching the back of her head when he leaned over her when she sat at the PACU desk.   (Doc. 145-4 at 23-24 (72:7-73:19); doc. 145-5 at 8-9 (82:1-93:1)).   Lackey also claims Dr. Johnson pulled her fake tiger tail, commented about getting "some tail" from Lackey, referred to Lackey and Anderson as lesbians, leaned over and tapped Lackey on the shoulder to indicate she should get up from her seat, once had an image of a woman in either a bathing suit or lingerie on his computer, referred to woman as "bitches" several times, and called Lackey "baby" several times.   (*See* doc. 145-3 at 22-24 (46:20-48:18, ex. 3)).

Lackey argues the alleged harassment is not similar to the cases SCA cites in support of summary judgment.   (Doc. 200 at 35-45).   Her arguments, however, are unpersuasive. Regarding *Hockman v. Westwood Communications, LLC*, 407 F.3d 317 (5th Cir. 2004), Lackey contends she "never described [Dr.] Johnson's harassment in such incidental terms," (doc. 200 at

42), referencing the *Hockman* plaintiff's testimony that the alleged harassment "would sort of brush up against [her]." To the contrary, as explained above, the only touching Lackey alleged in her deposition was that Dr. Johnson hugged her "maybe three times" and that Dr. Johnson's lower abdomen touched the back of her head when he leaned over her when she sat at the PACU desk. (Doc. 145-4 at 23-24 (72:7-73:19); doc. 145-5 at 8-9 (82:1-93:1)). Furthermore, Lackey ignores the remaining evidence in *Hockman*, which is worse than the behavior she described during her deposition, including slapping the plaintiff on the behind with a newspaper, "grab[ing] or brush[ing]" against the plaintiff's breasts and behind, standing in the doorway of the ladies' restroom as the plaintiff was washing her hands, attempting to kiss the plaintiff, etc. *See Hockman*, 407 F.3d at 321-22, 328. Despite all of these instances, which are worse than those Lackey describes, the *Hockman* court granted summary judgment.

Additionally, Lackey's argument that her allegations are worse than those in *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1260-62 (10th Cir. 1998), are based on a less than complete picture of the facts. The *Penry* court did not conclude that there was no "sexually offensive touching." *See id.* Instead, it concluded that, with respect to one plaintiff, the alleged harasser had "engaged in four specific acts of unwanted physical contact, all of which were because of her gender," in addition to the plaintiffs' allegation that he "needlessly touched [them] on many occasions throughout the years," and "would often sneak up from behind and grab [their] shoulders while loudly saying [their] name[s] to startle [them]," along with various inappropriate and, in some cases, sexual, comments. *Id.* at 1260-61. Yet, these allegations, which are worse than Lackey's, were found to fall short.

The cases upon which Lackey relies, *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), *Moore v. Corporate Facilities Management, LLC*,

No. 2:10-cv-3354-SLC, 2012 WL 4329288 (N.D. Ala. Sept. 17, 2012), and *Terry v. Laurel Oaks Behavioral Health Center*, 1 F. Supp. 3d 1250 (N.D. Ala. 2014), are distinguishable.  In *Johnson*, the plaintiff claimed the alleged harasser inappropriately rubbed his body parts against her, pulled his pants up in an obscene manner revealing an imprint of his private parts, stuck his tongue out at the plaintiff in an obscene manner, repeatedly attempted to massage the plaintiff's shoulders against her wishes, commented inappropriately about sex to the plaintiff, asked the plaintiff about her sex life, got close to the plaintiff's face as if to kiss her, looked her "up and down" while staring at her in a sexual manner, repeatedly commented that the plaintiff had a sexy voice, winked at the plaintiff, told the plaintiff "I like you and as long as I like you you're going to be all right.  You don't have to worry about your job," and made other sexual comments.  234 F.3d at 506.

In *Moore*, the plaintiff claimed her supervisor subjected her to daily sexual harassment, including brushing his hand on the plaintiff's butt, talking about sex, asking the plaintiff about her sex life, asking the plaintiff when she had sex, telling the plaintiff he wanted to come over to her house and get in bed with her, making noises like he and the plaintiff were having sex, and various other inappropriate comments.  2012 WL 4329288 at *7.  And in *Terry*, the plaintiff claimed that her supervisor repeatedly propositioned her for sex, including twice asking her to come to his house, once directed her to a back room where he wrapped his arm around her neck while telling her she "was driving him crazy" and that he "want[ed] [her] so bad," and once promising not to give up asking for sex until the plaintiff gave in; directed the plaintiff's attention to his noticeably erect private parts; commenting that the plaintiff's perfume aroused him; and bumping the plaintiff's knee and leg under the table several times a week during a three month period.  1 F. Supp. 3d at 1258-59, 1264-65.

The evidence in this case is wholly different than that presented in *Johnson, Moore,* and *Terry.* Lackey does not claim Dr. Johnson ever propositioned her for sex, asked about her sex life, made sexual comments about her, touched her in private areas of her body, or commented about or showed the imprint of his private parts. The cases Lackey presents do not establish that the alleged harassment she suffered was severe or pervasive. To the contrary, the few incidences to which Lackey testified (outside of her later-filed inconsistent declarations) that occurred during an approximately three month period are neither objectively severe nor pervasive to support a Title VII hostile work environment claim.

### b. There Must be a Basis to Hold the Employer Liable

Defendants also argue there is no basis to hold SCA liable for Dr. Johnson's actions. (Doc. 129 at 29-30, doc. 218 at 10-18). Where the plaintiff seeks to hold her employer responsible for the hostile environment created by the plaintiff's supervisor or coworker,[26] she must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Henson*, 682 F.2d at 905. The employee can demonstrate that her employer knew of the harassment by showing that she complained to higher management or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge.[27] *Id.*.

Lackey first complained about allegedly harassing conduct to Bates on January 19, 2011. (*See* doc. 140-31 at 134 (133:208)). Bates reported the complaint to SCA, including to Hammack, who conducted an investigation. (Doc. 127-3 at 35, 67 (138:9-139:12, 265:19-

---

[26] Although Dr. Johnson was not Lackey's director supervisor, it is undisputed that Dr. Johnson held a supervisory role in relation to Lackey. (*See* doc. 140-42).

[27] If the harasser is the plaintiff's employer, then the employer is liable for his actions without the operation of respondeat superior. *Henson*, 682 F.2d at 905 n.9. As thoroughly explained *supra*, Dr. Johnson was not Lackey's employer.

266:2); doc. 131-1 at 53, 54-55 (210:9-212:2, 215:8-216:1)).   Thereafter, SCA participated in a meeting with SCC, LLC's MEC, where Dr. Johnson agreed to the termination of his medical director services contract with SCC, LLC, an eight-week leave of absence, and that he would self-report to the Alabama Physician Health Program.   (Doc. 128-9 at ¶¶32, 26, 37; doc. 140-51).

Lackey did not experience any sexual harassment after her January 19, 2011 complaint. (Doc. 145-5 at 25 (99:23) – doc. 145-6 at 1 (100:2)).   In fact, Lackey resigned before Dr. Johnson returned from his eight-week leave of absence.   (Doc. 145-5 at 25 (99:10-12)). Accordingly, SCA's response to Lackey's complaint was effective as a matter of law.   *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1261 (11th Cir. 2003) (a plaintiff must prove that her employer failed to take immediate and appropriate corrective action).   Lackey's contention that the investigation into her complaint was not proper and incomplete, (*see* doc. 200 at ¶50), misses the point.   "[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow."   *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1288 (11th Cir. 2003). Thus, regardless of any claimed inadequacies in the investigation process, there is no genuine issue of material fact as to whether SCA acted reasonably to prevent and correct sexually harassing behavior.

SCA is entitled to summary judgment on Lackey's Title VII sexual harassment claim because the alleged harassment was not severe or pervasive as a matter of law or, alternatively, because there is no basis to hold SCA liable for Dr. Johnson's conduct.

### 2.  Title VII – Gender Discrimination (Disparate Treatment)

SCA argues it is entitled to summary judgment on Anderson and Lackey's claims for

gender discrimination.   In the complaint, Plaintiffs allege they were discriminated against on the basis of sex in regard to training, promotion, job assignments, job pay, and terms and conditions of employment.  (Doc. 22 at ¶97).  However, neither Plaintiff offers any evidence to support her gender discrimination claims and identifies no male employee who received more favorable treatment with respect to training, promotions, job assignments, job pay, or terms and conditions of employment.   Without such evidence, their claims fail.  *See Beard v. 84 Lumber Co.*, 206 Fed. App'x. 852, 857 (11th Cir. 2006) ("To establish a prima facie case of [] discrimination based on circumstantial evidence, [the plaintiff] must show that she was a qualified member of a protected class and was subject to an adverse action in contrast with similarly situated employees outside the protected class."); *see also Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) ("A discrimination claim under Title VII requires an adverse employment action.").

Plaintiffs' arguments to the contrary are unpersuasive as they focus on instances of alleged harassment, not adverse employment actions.   SCA is due summary judgment on Plaintiff's gender discrimination claims.

### 3.   Title VII – Retaliation

To establish a *prima facie* case of retaliation under Title VII, "the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there was some causal relation between the two events." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Meeks v. Computer Assocs., Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal citations omitted)).  SCA contends Lackey cannot establish she suffered an adverse employment action or that there was some causal relationship between her complaint and any alleged adverse employment action.  (*See* doc. 129 at 32).

To satisfy the adverse employment action requirement, "the plaintiff must show that a

reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).   A materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*   The materiality requirement is intended to "separate significant from trivial harms." *Id.*

Lackey concedes she was never disciplined during her employment and was neither demoted nor terminated.   Lackey's claim that she felt other teammates blamed her for SCA enforcing its policies prohibiting drinks and nail polish in patient care areas does not constitute an adverse employment action. *See e.g.*, *Roberts v. Segal Co.*, 125 F. Supp. 2d 545, 549 (D.D.C. 2000 ("The fact that plaintiff believes she was getting the cold shoulder from her co-workers does not constitute a materially adverse employment consequence. . . .").   Additionally, Lackey's belief that Dr. Johnson retaliated against her by ordering pain medicine to be administered through an intramuscular injection, as opposed to intravenously, is unavailing.   She acknowledges there are medical reasons for Dr. Johnson choosing this method and fails to attribute this conduct to SCA.

In her response, Lackey includes several allegations, such as Dr. Johnson "star[ing] at her with a sexually suggestive look" or "snarl[ing] with obvious distaste," (doc. 200 at 71), that are not supported by the record.   Likewise, there is no evidence Lackey ever went to Dr. Marecle to complain about Dr. Johnson, although Lackey now contends Dr. Marecle retaliated against her when he "defended [Dr.] Johnson" and told others not to hire her.   (Doc. 200 at 72, 75).   The argument that Dr. Johnson "began to make her work intolerable and thwarting [sic] her ability to care for her patients," (doc. 200 at 73), is similarly unsupported.   These are simply misrepresentations of the evidence properly before the court.   To the extent Lackey claims Dr.

Johnson was unresponsive when she sought physician orders, she does not claim this began after her January 2011 complaint.  To the extent she claims she never saw Dr. Johnson refuse an order from a nurse who had not complained, (doc. 200 at 74), neither cite Lackey provides (nor any other evidence) supports this assertion.   Furthermore, none of these – nor the allegations other than enforcement of the drink and nail polish polices – are attributable to SCA.  As Lackey herself states, "[p]laintiffs must show that their *employers* discriminated against them in retaliation for making a charge" and "[a]n *employer* can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace."  (Doc. 200 at 67-68) (emphasis altered).   There is no evidence of a materially adverse employment action and no evidence of a retaliatory hostile work environment to support such a claim.  *See Gowski v. Peake*, 682 F.2d 1299, 13120-13 (11th Cir. 2012).

Lackey also fails to present evidence to support a claim of constructive discharge.  A constructive discharge occurs when a discriminatory employer imposes working conditions that are "so intolerable that a reasonable person in [the employee's] position would have been compelled to resign."  *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003).  "The standard for proving constructive discharge is higher than the standard for proving hostile work environment."  *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1282 (11th Cir. 2003) (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001)).

The conduct about which Lackey complains falls far short of the level required to prove constructive discharge, as it does not even rise to the level of an actionable hostile work environment.  *See id.*  Furthermore, an employee stating a constructive discharge claim has a duty to act reasonably before choosing to resign.  *See Garner v. Wal-Mart Stores, Inc.*, 807 F.2d

1536, 1539 (11th Cir. 1987).  SCA replaced Dr. Johnson as medical director, and Dr. Johnson took an eight-week leave of absence during which time he received treatment.  It was unreasonable for Lackey to resign without waiting to determine the effectiveness of these steps. *See Mitchell v. Pope*, 189 Fed. App'x. 911, 914 (11th Cir. 2006) (plaintiff's failure to provide employer with opportunity to remedy the situation barred constructive discharge claim); *Van Der Meulen v. Brinker Int'l*, 153 Fed. App'x. 649 (11th Cir. 2005); *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).

Furthermore, the evidence indicates SCA did not to force Lackey to resign, as it is undisputed that Bates and Gill tried to talk Lackey out of resigning when she submitted her notice.  And, the fact Lackey worked from the date of her verbal notice, February 25, 2011, to March 11, 2011, bellies her claim that working conditions were intolerable.  *See Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 64 (5th Cir. 1980) (affirming summary judgment on constructive discharge claim when the plaintiff gave two weeks' notice).

As to Anderson, SCA also argues her retaliation claim fails because she cannot demonstrate a materially adverse employment action or causation.  (Doc. 137 at 22-23).   In her response brief, Anderson argues SCA reduced her hours following her 2010 and 2011 complaints.  (Doc. 201 at 52).  However, in her deposition, Anderson does not identify a reduction in hours as retaliation for either of her complaints.  (Doc. 140-31 at 180-84 (179:15-183:21)).  Anderson never mentioned a reduction in hours and testified that her hours could vary, from 2.5 to 8.5 hours a day, depending on a formula derived from the patient census.  (*Id.* at 103 (102:3-6)).  To the extent her declaration states otherwise, it contradicts her clear deposition testimony and is due to be stricken.  *See Van T. Junkins & Assocs., Inc.*, 736 F.2d at 657.

Anderson did testify that she was retaliated against when she was required to fill out a

new employment application and when inquiries were made into her nursing license.  (Doc. 140-31 at 184 (183:6-21)).  However, in her brief, Anderson does not argue these constitute material adverse employment actions and does not dispute SCA's position that her 2011 disciplinary write-up cannot support a retaliation claim.  (Doc. 137 at 24-25).  The only adverse employment action Anderson identifies in both her deposition and brief as the basis of her retaliation claim is being assigned additional safety officer duties.  (Doc. 140-31 at 184 (183:7-14)).  The Safety Officer Maintenance Supervisor position was held by Kari Walker during her employment with SCA.  (*Id.* at 22-25 (21:20-22, 22:18-22, 23:16-24:5)).  Walker was a registered nurse.  (Doc. 140-32 at 11 (11:6-11)).  Anderson complains she was also assigned job duties belonging to Roger Lee and Amy Shelton when their employment ended.  (Doc. 178-3 at ¶265).  Shelton and Lee were also nurses in the PACU.  (*Id.* at ¶16).  The evidence establishes that the additional duties Anderson complains about were previously performed by other nurses.

An employment action "is not adverse merely because the employee dislikes it or disagrees with it," and "not everything that makes an employee unhappy is an actionable adverse employment action."  *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998).  However, "a plaintiff need only show a materially adverse action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Worley v. City of Lilburn*, 408 Fed. App'x 248, 250 (11th Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).  "[T]he acts must be material and significant and not trivial.  *Id.*  This less stringent standard "strongly suggests that it is for the jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions."  *Id.* (citing *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008)).

55

Anderson testifies that, after her complaints, SCA management assigned her additional duties but did not provide her the time to complete them.  (Doc. 178-3 at ¶165).  She contends that to complete these duties she had to work off the clock.  (*Id.*).  This is certainly more than "petty and trivial" and "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.

Additionally, Anderson's claims regarding Dr. Johnson's alleged retaliation do not constitute adverse employment actions by SCA.  The only allegation of retaliatory harassment contained in both her deposition and brief is the allegation that Dr. Johnson said she was on a work-release program from prison.  (Doc. 140-31 at 182 (181:8-11)).  As noted throughout this recommendation, the undersigned will not consider the material in Anderson's declaration that flatly contradicts her deposition testimony.  Even if attributable to SCA, this is insufficient.  *See Gowski v. Peake*, 682 at 1299.  SCA is not entitled to summary judgment on Anderson's retaliation claim because Anderson has offered evidence of an adverse employment action – the assignment of additional duties that required she work off the clock.

Anderson's constructive discharge claim also fails.  Anderson testified that following her 2011 complaint, she was not further sexually harassed. (Doc. 140-31 at 152 (151:1-5)).  Her attempt to materially change this testimony and claim she was subject to "over four years of egregious sexual harassment," (doc. 201 at 69), is without support.  Anderson's argument that she feared Dr. Johnson would fire her is contradicted by her own testimony that Dr. Johnson did not have the authority to fire SCA employees.  (Doc. 140-31 at 130 (129:16-21)).  Simply put, based on the admissible evidence before this Court, no reasonable jury could find that Anderson's working conditions became "so intolerable that her resignation qualified as a fitting response."  SCA is due summary judgment on Anderson's constructive discharge claim.

### 4. Tort Claim

Dr. Johnson also seeks summary judgment on Plaintiffs' intentional infliction of emotional distress and invasion of privacy claims, as well as Lackey's assault and battery claim. (Doc. 132).

### a. Intentional Infliction of Emotional Distress/Outrage

Dr. Johnson contends Plaintiffs' claims for intentional infliction of emotional distress, commonly referred to as the tort of "outrage," fail as a matter of law because Plaintiffs fail to allege conduct sufficient to state a claim. (*See* doc. 132 at 14-17; doc. 227 at 13-15). Plaintiffs allege Dr. Johnson committed "egregious sexual harassment" that was "beyond the bounds of decency." (Doc. 111 at ¶137).

As an initial matter, the tort of outrage is subject to a two-year statute of limitations. *Rester v. McWane, Inc.*, 962 So. 2d 183, 186 (Ala. 2007); *see* ALA. CODE § 6-2-38. Plaintiffs filed this action on February 21, 2012. (Doc. 1). Accordingly, any alleged actions occurring prior to February 21, 2010, are outside the statute of limitations, unless Plaintiffs establish otherwise. Plaintiffs argue the tort of intentional infliction of emotional distress (or outrage) is a "continuing tort," and, therefore, they are not restricted by the two-year statute of limitations. (Doc. 202 at 32-33). Plaintiffs rely on older toxic tort and insurance cases; however, as Dr. Johnson points out, more recently the Alabama Supreme Court held that the two-year statute of limitations applies to these torts *in the sexual harassment context*. *Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 888 (Ala. 1995). In *Mardis*, although the plaintiff contended her tort claims were continuing torts, the court held all acts of sexual harassment that occurred prior to the two-year statutory period were time-barred pursuant to Alabama Code §6-2-38(*l*) and could not be considered as the basis for the claim. 669 So. 2d at 888.

Anderson claims Dr. Johnson "continually" sexually harassed her from the beginning of her of employment in November 2006, more than three years prior to the beginning of the limitations period.  (Doc. 140-31 at 35-47 (34:15-46:10)).  Notably, Anderson's most egregious allegations of harassment are from prior to the beginning of the limitations period, including her testimony that Dr. Johnson kicked, choked, and kissed her.  (*Id.* at 115-16, 123 (114:6-11, 114:19-115:6, 122:1-17)).  This is not a situation where the plaintiff did not have knowledge that her tort claim accrued because the conduct had not reached a minimum threshold.  Anderson's contention that Dr. Johnson's conduct worsened after the 2010 complaints/investigation is flatly contradicted by her prior sworn testimony.  (*Id.* at 138-30, 142-43, 152 (141:14-142:2, 137:16-138:22, 151:1-4); doc. 150-54 at 18).  In light of the most recent Alabama case law on point, the court should not consider any incidents of sexual harassment outside of the statute of limitations, as those acts cannot form the basis of this action. *See Mardis*, 669 So. 2d at 889.

Intentional infliction of emotional distress "is a very limited cause of action that is available only in the most egregious circumstances."  *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).  Plaintiffs prove this tort by demonstrating that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) and caused emotional distress so severe that no reasonable person could be expected to endure it.[28] *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 364 (Ala. 1980).  As to the second element, a plaintiff must prove that the defendant's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Id.* at 365.

---

[28] Plaintiffs' contention that Dr. Johnson does not "dispute" elements one and three, (doc. 202 at 12), is unsupported.

Much of the Plaintiffs' argument relies on material from their unsolicited, "combined statement of facts," (doc. 180), largely based on the Plaintiffs' declarations, much of which contradict their prior sworn deposition testimony, as well as other assertions not based on the declarant's personal knowledge. (Doc. 202 at 15-31). Anderson also almost exclusively relies on facts from the beginning of her employment through 2009, (doc. 202 at 16-22), which are outside the limitations period. Neither are proper considerations.

Anderson testified that, after 2010, Dr. Johnson only touched her once, on her arm. (Doc. 140-31 at 138-39 (137:16-138:22))). She also testified that she did not recall Dr. Johnson ever doing anything that she felt was sexually offensive after her 2011 complaint. (*Id.* at 152, 151:1-5)). Lackey testified Dr. Johnson hugged her "maybe three" times, but that he did not place his hands in inappropriate places or rub his body against her in a sexual way and that Dr. Johnson never tried to kiss her. (Doc. 145-4 at 23-24 (72:7-73:19); doc. 145-5 at 8-9 (82:1-93:1)). There is simply no admissible evidence of the "extreme and outrageous" conduct required for this claim.

Additionally, based on the admissible evidence a reasonable jury could not conclude that Dr. Johnson's alleged conduct caused Lackey (or Anderson) emotional distress so severe that no reasonable person could be expected to endure it. *See Am. Road Serv. Co.*, 394 So. 2d at 364. One of Lackey's primary complaints is that Dr. Johnson pulled her "tiger tail" and made related comments in October 2010. However, Lackey testified that she did not complain to anyone about the incident until January 2011, and further testified that she did not suffer any physical damage or seek treatment after the alleged incident. Furthermore, Lackey may not rely on allegations that she suffered emotional distress by seeing or knowing about how Dr. Johnson allegedly treated Anderson. Alabama law does not recognize a "bystander" theory of recovery

for intentional infliction of emotional distress.  *Gideon v. Norfolk S. Corp.*, 633 So. 2d 453, 454 (Ala. 1995).  Only the direct victim may sue for intentional infliction of emotional distress.  *E.P. v. McFadden*, 785 So. 2d 364, 367 (Ala. Civ. App. 2000) (per curiam), *rev'd on other grounds*.

Neither Plaintiff has adduced sufficient evidence to create a jury question on this issue. *Compare Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989) *with Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1434 (Ala. 1998).  Accordingly, Dr. Johnson is entitled to summary judgment on the Plaintiff's intentional infliction of emotional distress claims.

### b.  Invasion of Privacy

Under Alabama law, "invasion of privacy" consists of four distinct torts: "(1) the intrusion upon the plaintiff's solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for commercial use." *Phillips v. Smalley Maintenance Servs., Inc.*, 435 So. 2d 705, 708 (Ala. 1983).  Each variation of the invasion of privacy tort has distinct elements and a separate privacy interest that may be invaded.  *S.B. v. Saint James School*, 959 So. 2d 72, 90 (Ala. 2006) (citing *Regions Bank v. Plott*, 897 So. 2d 239 (Ala. 2004)).  Anderson and Lackey contend Dr. Johnson is liable for the first three of the four possible types of invasion of privacy.

A claim for invasion of privacy is subject to a two-year statute of limitations.  ALA. CODE § 6-2-38 (1975); *see Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007).  Any alleged acts occurring more than two years prior to the date Plaintiffs filed this action are untimely and will not be considered.  Thus, the relative time period is February 21, 2010, to February 21, 2012.  (*See* doc. 1).  Any statements made prior to February 21, 2010, are barred from consideration.

60

### 1.  Intrusion Upon Solitude or Seclusion

To succeed on a claim alleging intrusion-based invasion of privacy relating to sexual harassment, a plaintiff must show: (1) that the matters intruded to are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation.  *Ex parte Atmore Comm. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (citing *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 323 (Ala. 1989)).   For example, "[w]hile asking a co-employee for a date and making sexual propositions usually do not constitute an invasion of privacy, extensive inquiries into one's sex life or looking up one's skirt may constitute an invasion of privacy."  *Id.* (citations omitted).  And, "extensive egregious inquiries into one's sex life, coupled with intrusive and coercive sexual demands" could constitute a "wrongful intrusion into one's private activities sufficient to 'outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 826 (Ala. 1999).

At her deposition, Lackey testified that she suffered an "invasion of privacy" when she felt harassed in the workplace, including Dr. Johnson's statements about her and Anderson being lesbians and handling dicks, Dr. Johnson answering the phone in a strange manner, and Dr. Johnson's actions toward Anderson.  (Doc. 145-10 at 1-3 (200:15-202:5)).   There is no evidence Dr. Johnson made any, much less extensive, inquiries into Lackey's sex life, propositioned her for sex, touched Lackey in a sexual way, or otherwise made any sexual advances towards her. While Lackey claims in one of her briefs that Dr. Johnson "made numerous inquiries into" Lackey's sex life, (doc. 202 at 43), she cites to no evidence and the court could not find any other comments except comments about Lackey being a lesbian.  Similarly, Lackey has claimed in briefing that Dr. Johnson also made egregious sexual propositions to her, (doc. 202 at 39), and

"touched Lackey's butt and pulled her pants down" (doc. 202 at 42), but there is no admissible evidence that either of these things occurred.   Disregarding the misrepresentations and exaggeration of evidence, Lackey has not offered evidence to create a genuine issue of material fact.  *See Ex parte Atmore Comm. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (tortfeasor "made several lewd comments and asked Turner to meet him outside of work hours for other than business purposes and looked up her skirt on more than one occasion); *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 711 (Ala. 1983) (tortfeasor "insisted [the plaintiff] engage in oral sex with him at least three times a week"); *Cunningham v. Dabbs*, 703 So. 2d 979, 980 (Ala. Civ. App. 1997) (multiple propositions for sex).

As for Anderson, she testified at her deposition that Dr. Johnson touched her one time since 2010, when, "instead of taking whatever it was I hand[ed] him, he slowly drug his hand down my arm and hand."  (Doc. 140-31 at 138-140 (137:18-139:21).  Anderson also testified that Dr. Johnson gave her hugs.  (*Id.* at 141-142 (140:14-141:03).  Other than hugs and the one time Dr. Johnson ran his hand down her arm, Anderson identified few instances of alleged sexual harassment.  (*Id.* at 138-146).  Anderson testified Dr. Johnson made statements about she and Lackey being lesbians and that, in the context of catheterizing male patients, Dr. Johnson stated that Lackey should get pointers from Anderson about handling "dicks."  (*Id.*at 144-146).   To the extent Anderson argues her privacy was intruded upon when Dr. Johnson shared his sexual interest with her, this is not Dr. Johnson intruding upon her private affairs.  This alleged conduct is markedly different than the cases cited by the plaintiffs, which involve requests for sexual conduct or sexual assault.

### 2.  Publicity

To state a claim for invasion of privacy based on giving publicity to private information,

the Alabama Supreme Court has stated that:

> One who gives *publicity* to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
>> (a) would be highly offensive to a reasonable person, and
>> (b) is not of legitimate concern to the public.

*S.B. v. Saint James School*, 959 So. 2d 72, 91 (Ala. 2006) (citing Restatement (Second) of Torts § 652D). One gives "publicity" by communicating the matter "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become public knowledge." *Id.* at 92 (quotation omitted). Because the matter is communicated to the public at large, "it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Id.* (emphasis removed) (quotation omitted). The phrase "small group of persons" has no exact definition, but the often repeated characterization of the number of persons to which the information must be communicated in order to constitute publicity is "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Ex parte Birmingham News, Inc.*, 778 So. 2d 814, 818 (Ala. 2000) (citations omitted).

The plaintiffs' reliance on this Court's decision in *Livingston v. Marion Bank & Trust Co.*, 30 F. Supp. 3d 1285 (N.D. Ala. 2014), is misplaced. (*See* 202 at 45). Although the plaintiffs contend this Court denied summary judgment on the plaintiff's invasion of privacy claim because there was evidence the tortfeasor made the statements in front of third parties, (*id*), in fact, the court denied summary judgment because the defendant's motion did not contest that such a publication to third parties of private information could support a claim for invasion of privacy. *Livingston*, 30 F. Supp. 3d at 1322. However, the court noted that the requirement of giving "publicity" to the subject information to support an invasion of privacy claim is more than

merely "publishing" information to a third party (as required for defamation). *Id.* at n.16.   The court concluded that "it is questionable whether such evidence is sufficient to establish that [the alleged tortfeasor] gave 'publicity' to it." *Id.*

Lackey and Anderson offer no evidence that Dr. Johnson communicated any information about them to the *public at large*.   At most, the comments of which they complain were, at most, allegedly made in front of a few co-workers and patients and their families and, even viewing this in the light most favorable to the plaintiffs, such communication is not "substantially certain to become one of public knowledge."   *S.B. v. Saint James School*, 959 So. 2d 72, 92 (Ala. 2006)

### 3.  False Light

A claim for invasion of privacy based on putting one in a false light also requires proof the plaintiff gave "publicity to a matter concerning another that places the other before the public in a false light. . . ."   *S.B.*, 959 So.2d at 93. (quotations omitted).   Plaintiffs have offered no evidence that Dr. Johnson gave the requisite publicity to any information regarding them (whether false or not), as no statements were made to the public at large or in a manner where it was substantially certain to become public knowledge.   Furthermore, because of the different standard of publicity, the plaintiffs' references to cases regarding claims for defamation are irrelevant in this case. (*See* doc. 202 at 43-44).

### c.  Assault and Battery

Both Plaintiffs allege Dr. Johnson is liable for the interrelated tort theories of assault and battery; however, Dr. Johnson moves for summary judgment as to Lackey's claim only.

Under Alabama law,

an assault consists of 'an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not

prevented.'

*Livingston v. Marion Bank & Trust Co.*, 30 F. Supp. 3d 1285, 1322 (N.D. Ala. 2014) (quoting

*Peterson v. BMI Refractories*, 132 F.3d 1405, 1412-13 (11th Cir. 1998)) (citations omitted).

Furthermore,

> [a] battery has been defined by the Alabama Supreme Court as follows: 'A successful assault becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner . . . to lay hands on another in a hostile manner is a battery, although no damage follows.'

*Id.* at 1322-23 (quoting *Peterson*, 132 F.3d at 1412-13) (citations omitted).  Battery encompasses

the rude or offensive touching of another person's clothing.  *Hyde v. Cain*, 47 So. 1014, 1014

(1908); *Mills v. Wex-Tex Industries, Inc.*, 991 F. Supp. 1370, 1382 (M.D. Ala. 1997).  "The

wrong [in committing a battery] consists, not in the touching so much as in the manner or spirit

in which it is done, and the question of bodily pain is important only as affecting damages."

*Livingston*, 30 F. Supp. 3d at 1323 (quoting *Harper v. Winston County*, 892 So.2d 346, 353 (Ala.

2004)).  The Alabama Supreme Court has found sufficient evidence of a battery where the

plaintiff's supervisor "touched her waist, rubbed against her when passing her in the hall, poked

her in the armpits near the breast area, and touched her leg."  *Ex parte Atmore Community Hosp.*,

719 So. 2d 1190, 1194 (Ala. 1998).   There must be substantial evidence that the alleged

touching occurred with sexual overtones and was unwelcome.  *Evans v. Mobile Infirmary Med.*

*Ctr.*, 2005 WL 1840235, at *6 (S.D. Ala. Aug. 2, 2005).

    As with her other claims, Lackey relies on statements contained her declaration that are

contradicted by her prior sworn deposition testimony.  During her deposition, Lackey testified

that Dr. Johnson "leaned over" behind the nurses' desk a few times and his "lower abdominal

area" touched the "back of her head."  (Doc. 145-5 at 8 (82:1-22)).  In her later filed declaration,

Lackey states that Dr. Johnson "pushed his pelvis and genitals against her back in a sexual manner."  (Doc. 180 at ¶620).  Additionally, Lackey testified at her deposition that Dr. Johnson hugged her "maybe three" times, but that he did not place his hands on an inappropriate place, rub his body against her in a sexual way, or try to kiss her.  (Doc. 145-4 at 23-24 (72:7-73:19); doc. 145-5 at 8-9 (82:1-93:1)).  Similarly, although Lackey now alleges Dr. Johnson grabbed her costume tiger tail, pulled down her pants, and touched her butt, (doc. 202 at 49), she testified that Dr. Johnson put his hand on her shoulder during the incident.  (Doc. 145-4 at 4 (53:4-10)).  Lackey cannot rely on these inconsistent statements to avoid summary judgment.  *See Van T. Junkins & Assocs.*, 736 F.2d at 656.

Lackey points to the Court's decision in *Livingston v. Marion Bank & Trust Co.*, where the court denied summary judgment as to the plaintiff's assault and battery claim.  30 F. Supp. 3d at 1323.  The summary judgment evidence in this case falls well-short of the evidence before the court in *Livingston*.  The court stated as follows:

> [Plaintiff] alleges that Taylor touched her face and played with her hair. She says that he frequently placed his hand on the small of her back to "guide" her closer to him, ostensibly to view documents she was holding. [Plaintiff] also claims that Taylor at times tugged on her skirt and blouse, including one time where he untied the strings securing the latter, put his arm on her to stop her from walking away from him, and instructed her to allow him to retie them while suggesting that it might appear to other employees that they were having a sexual affair.

*Id.*.  In light of these facts, the court explained that

> [w]hile these are not blatantly offensive physical contacts, there is sufficient evidence from which to infer that such touching was intentional, gratuitous, conducted with sexual overtones, and was unwelcome. As such, there is sufficient evidence from which a jury could find that Taylor committed a battery, the apprehension of which by [Plaintiff] would give rise to an assault.

*Id.*  Disregarding the inconsistent declarations and statements of counsel not supported by admissible evidence, no such evidence exists in this case.  Lackey did not testify that any of the

alleged touching had sexual overtones or was done in a rude or angry manner.  Lackey lacks sufficient evidence to create a jury question as to her assault and battery claim.

## IV. Documents 138 and 141: Plaintiffs' Motions for Summary Judgment on Certain Affirmative Defenses

Plaintiffs have filed motions for partial summary judgment as to various affirmative defenses.  (Docs. 138 & 141).  The undersigned does not believe that a lengthy report and recommendation addressing affirmative defenses on claims that may or may not survive summary judgment and based on evidence that may be stricken is the best use of the court's resources at this time.  The availability of the affirmative defenses depends on issues the undersigned addresses in this report and recommendation, which the court may or may not accept.  For example, the majority of Plaintiff's motion for partial summary judgment, (doc. 138), addresses the *Faragher/Ellerth* defense, which applies in situations where the harasser is an agent of the employer, and the employer is vicariously liable for the harasser's acts.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998).  Because the undersigned concluded Dr. Johnson was not an agent or employee of SCA, this defense may not apply.  Similarly, because the undersigned recommends all claims asserted against Dr. Johnson be dismissed except for Anderson's state law assault and battery claim, much of Plaintiffs' motion for partial summary judgment on Dr. Johnson's affirmative defenses, (doc. 141), is unnecessary.

After the parties have had an opportunity to file objections to this report and recommendation and a district judge rules on the motions for summary judgment addressed herein, as always, the district judge may refer this matter to the undersigned to address any remaining motions.

## V. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** as follows:

- SCC, LLC's Motion for Summary Judgment, (doc. 118), be **GRANTED**;

- SCC, Inc.'s Motion for Summary Judgment, (doc. 119), be **GRANTED**;

- SCA's Motion for Summary Judgment as to Lackey's Claims, (doc. 121), be **GRANTED**;

- SCA's Motion for Summary Judgment as to Anderson's Claims, (doc. 123), be **GRANTED IN PART AND DENIED IN PART**. Specifically, the undersigned recommends the motion be granted except as to Anderson's claim for retaliation based on the imposition of additional job duties after her complaints. Anderson's claim for sexual harassment/hostile work environment against SCA also goes forward, as SCA did not move for summary judgment on this claim.

- Dr. Johnson's Motion for Partial Summary Judgment, (doc. 132), be **GRANTED**. However, Anderson's claim for the state law tort of assault and battery as to Dr. Johnson is to go forward, as Dr. Johnson did not move for summary judgment on this claim.

- COPS's Motion for Summary Judgment, (doc. 182), be **GRANTED**;

- All claims asserted by Lackey are to be **DISMISSED**;

- Plaintiff's Motion for Partial Summary Judgment on certain affirmative defenses (entity defendants), (doc. 138) and Plaintiff's Motion for Partial Summary Judgment on certain affirmative defenses (Dr. Johnson), (doc. 141), remain pending.

## VI. Notice of Right to Object

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal, except for plain error. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

DONE this 13th day of January, 2017.

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE