FILED
2017 Sep-10  PM 07:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DANA ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO.** |
| | ) | **2:12-cv-00598-AKK** |
| **v.** | ) | |
| | ) | |
| **SURGICAL CARE AFFILIATES,** | ) | |
| **LLC; and KEVIN JOHNSON,** | ) | |
| **M.D., individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## PLAINTIFF DANA ANDERSON'S MOTION TO RECONSIDER ORDER GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM AGAINST DEFENDANT SURGICAL CARE AFFILIATES.

---

Plaintiff Dana Anderson hereby moves this Court, pursuant to Rule 54(b), Fed. R. Civ. Proc., for an Order reinstating her dismissed Title VII constructive discharge claim against Defendant Surgery Care Affiliates, LLC.  Plaintiff makes this motion based upon an intervening change in controlling law.  *Longcrier v. HL-A Co., Inc.*, 595 F.Supp.2d 1218, 1247 (S.D. Ala. 2008) (a party may move for reconsideration when there has been an intervening change in controlling law) (citing *Vidinliev v. Carey Int'l, Inc.*, 2008 WL 5459335, at *1 (N.D. Ga. 2008).

1.    Rule 54(b), Fed. R. Civ. Proc., provides, in part, that "an order or other

decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."

2.    On January 23, 2017, Magistrate Judge England issued his Report and Recommendation, recommending, in part, that SCA (Surgical Care Affiliates) was due summary judgment on Plaintiff Dana Anderson's constructive discharge claim on the grounds that "no reasonable jury could find that Anderson's working conditions became "so intolerable that her resignation qualified as a fitting response." (Doc. 249: p. 56.)

3.    Significantly, SCA did not file for summary judgment as to Plaintiff Anderson's Title VII hostile environment claim. (Doc. 123: p. 2.)

4.    Plaintiff Anderson filed her objections to the Magistrate Judge's Report and Recommendation and this Court conducted a *de novo* review of those recommendations. (Doc. 262.)

5.    The Court considered Plaintiff Anderson's constructive discharge claim along with the constructive discharge claim of Plaintiff Lackey. (Doc. 262: pp. 21-23.) In analyzing this claim, the Court looked to controlling Eleventh Circuit precedent, *i.e. Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974 (11th Cir.

2

2003) and *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272 (11th Cir. 2003). Taken together, these cases establish two principles: the standard for proving constructive discharge is higher than the standard for proving hostile work environment, and plaintiff must prove that the employer imposed working conditions that are so intolerable that a reasonable person in the employees position would have been compelled to resign. (Doc. 262: p. 22.)

6.    These cases, taken together, suggest that, no matter how outrageous the conduct is that contributes to a hostile work environment, a plaintiff is not justified in quitting her employment unless she proves something more that makes the working conditions intolerable.

7.    This Court agreed with the Magistrate Judge that Plaintiff Anderson could not meet these standards because her fear of being terminated was premised on a subjective perception that had no basis in fact and because Anderson resigned during Dr. Johnson's leave of absence.[1]   "As such, no basis exists to find that Anderson's working conditions were 'so intolerable that a reasonable person

---

[1]The Court's conclusion that Anderson had resigned during Dr. Johnson's leave of absence is a material fact in dispute.  Dana Anderson testified that she resigned her employment in March of 2012. (Doc. 140-31 at 157.) On March 2, 2011, the Medical Executive Committee met regarding the allegations against Dr. Johnson.  (Doc. 140-51: p. 1.) Dr. Johnson resigned as Medical Director at that meeting and agreed to take an eight week leave of absence during the months of March and April 2011.  (*Id.*; Doc. 134-2:26, p. 257, l. 15-17.)   While Lackey resigned effective March 11, 2011, Dana Anderson continued to work for another year, including after Dr. Johnson returned to the Surgical Center from his leave of absence.

in [her] position would have been compelled to resign."  (Doc. 262: p. 23.)

8.    Apparently because SCA had not moved for summary judgment as to Anderson's hostile environment claim, the Court did not focus on the conduct that formed the basis of her claiming, including all of the facts set forth in Plaintiff's Combined Statement of Undisputed Facts pertaining to Plaintiff Anderson.

9.    The Supreme Court, itself, has established a standard for proving a claim that sexual harassment resulted in constructive discharge in *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). "To establish hostile work environment, plaintiffs [ ] must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their[ employment. . . . Beyond that, we hold, to establish 'constructive discharge,' the plaintiff must make a further showing. She must show that the abusive work environment became so intolerable that her resignation qualified as a fitting response."  *Id.* at 133-34 (internal references omitted).

10.   This does not mean that, in every instance where a plaintiff is subjected to a sexually hostile work environment she must prove "something more" in order to prove her constructive discharge claim.  All that *Suders* requires as a first step is that the severity of harassment meet the minimum required for a sexual

4

harassment claim.  If the severity of the harassment exceeds that minimum - has some aggravating circumstances - the harassment, itself, can justify a constructive discharge claim.  *Arredondo v. Estrada*, 120 F.Supp.3d 637, 647 (S.D. Tex. 2015) (extreme and outrageous conduct occurring on a regular basis that demeans a worker on a gender is sufficient to support Title VII claims for both sexual harassment and constructive discharge).

11.  On September 7, 2017, the Eleventh Circuit decided *Hicks v. City of Tuscaloosa, Al.*, 2017 WL 3910426 (11th Cir. 2017).  In *Hicks*, the plaintiff brought claims of pregnancy discrimination (breast feeding), interference with her FMLA leave, retaliation her because of her FMLA leave, and constructive discharge.  Hicks worked for the Tuscaloosa Police Department, first as a patrol officer and then as an investigator on the narcotics task force.  She was working on that task force when she became pregnant.  Her captain allowed her to work on pharmaceutical fraud cases so that she could avoid working nights and weekends.

12.  Hicks took twelve weeks of FMLA leave to have her baby.  On Hicks first day back to work she was written up and told that she should start working with confidential informants.   When Hicks expressed some reluctance to work nights, she was reassigned from the narcotics task force to the patrol division.

As a result of the reassignment, Hicks lost her vehicle and her weekends off and was going to receive a pay cut and different job duties. In addition, officers in the patrol division were required to wear ballistic vests all day.

13. *Before Hicks began working in the patrol division*, she took time off for postpartum depression. During that time her doctor recommended that she be considered for alternative duties because the ballistic vest she was required to wear was restrictive and *could cause* breast infections that lead to an inability to pump breast milk. The Chief did not believe that Hicks had any limitations and denied this request.

14. When Hicks returned from leave she met with the Chief and, in accordance with her doctor's suggestion, requested a desk job where she would not be required to wear a vest and assurances that she would be allowed to take breaks to breastfeed. The Chief responded that the only options for Hicks were (1) not wearing a vest while on patrol, or (2) wearing a vest that could be specially fitted for her. Hicks considered the first option not to be an accommodation because it was so dangerous. Furthermore, she rejected the second option because the larger or "specially fitted" vests were also ineffective because they left gaping, dangerous holes. Hicks resigned that very day without any further attempt to see if either of the options offered to her would be acceptable. *Id.*

6

at 2.

15.   The jury returned verdicts for the defendant on the FMLA interference claim and for the plaintiff on the remaining claims.  Specifically, the jury found that the city had violated Title VII (the Pregnancy Discrimination Act ["PDA"]) when it reassigned the plaintiff from a position that permitted plaintiff to avoid "on call" duty to a patrol position, where she would be required to wear ballistic vests all day.  *Id.* at 2.  The jury also found that the City's failure to accommodate Hick's breastfeeding requests constituted discriminatory constructive discharge, in violation of the PDA.  *Id.*

16.   The Court of Appeals affirmed the verdict in its entirety.  The Court found that there was enough convincing evidence that would allow a jury to infer intentional discrimination.  *Id.* at 3.

17.   More importantly, the Court upheld the jury's verdict on constructive discharge.  Hicks had argued that the Chief's options - patrolling without a vest or patrolling with an ineffective larger vest - make work conditions so intolerable that any reasonable person would have been compelled to resign.  *Id.*  The jury found that the conditions offered by the Chief were so intolerable that a reasonable person would be forced to resign and the Court of Appeals affirmed.  *Id.*

18.   Significantly, the Court looked to a more recent Supreme Court case for the constructive discharge standard: "[c]onstructive discharge claims are appropriate when 'an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.' *Green v. Brennan*, 578 U.S. __, )), 136 S.Ct. 1769, 1776 (2016). 'When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge.'  *Id.* at 1776-77." *Hicks*, at *3.

19.   The Eleventh Circuit recognized in *Hicks* that sometimes the facts that support a claim for hostile environment are sufficiently severe as to support an independent constructive discharge claim.  Furthermore, to the extent any "further showing" is necessary to establish a constructive discharge claim, that showing can be minimal.  In *Hicks*, plaintiff was able to meet that showing merely by pointing to two theoretical options which she did not consider adequate. She was not even obligated to see if either option would, in fact, accommodate her needs.

20.   Plaintiff Dana Anderson was subjected to a severely hostile work environment.  She had to tolerate gender derogatory language, describing women as "bitches," "sluts," "whores," "cum-dumpsters," and "fuck buddy." Dr. Johnson

would watch pornography in the workplace and would give pornographic DVS's to female employees. Dr. Johnson touched and threatened Anderson in a sexual and intimidating manner. His conduct was sufficient to state claims for assault, battery, and intentional infliction of emotional distress. After Plaintiff and others complained about this conduct, Dr. Johnson took a voluntary leave of absence. Nevertheless, during that leave of absence, SCA singled out Plaintiff for additional assignments and threatened Anderson with termination if she caused any errors in her new assignments. Nevertheless, Anderson did not resign, believing that because Dr. Smith had been named Medical Director, that Dr. Johnson would not return. Then, to Anderson's dismay, Dr. Johnson returned to the facility as the anesthesiologist and she was required to work with him again. During this time, Anderson overheard Dr. Johnson tell Crook that if she would put enough on Anderson, she will leave.

21.    This conversation upset Anderson and would have been sufficient to justify any other person to quit. But Anderson did not because she needed the job. Then, in June 2011, Bates on behalf of SCA began auditing Anderson's nursing license. In July 2011, during a staff meeting, Dr. Johnson looked at Anderson and said "oh, we've got some good employees, but we have others who are blood-sucking parasites who just want to ride on the coattails of

others, the rest of their lives."   In August, 2011, Dr. Marecle, referring to Anderson in front of other employees and patients, said: "don't believe a word that comes out of her mouth, she tells nothing but lies."  Also in August 2011, Anderson was put in the position of being alone with Dr. Johnson to close the facility, despite the fact that after the 2011 investigation she had been assured that she would not be left alone with Dr. Johnson.  Finally, after questioning her integrity and constant threats of termination, Ms. Anderson went on FMLA leave in January 2012 and, in March 2012, resigned and looked for alternative employment.

22.   If Ms. Hicks' resignation, because she did not agree with the two options offered to her by the Tuscaloosa Chief of Police, is sufficient "further showing" to establish a constructive discharge, then the treatment suffered by Anderson after Dr. Johnson's return from leave exceeds that showing.  Unlike Ms. Hicks, Ms. Anderson actually worked with SCA to determine whether or not its response to the hostile environment complaints would remedy the situation.   There is no legal basis for imposing a greater standard on Ms. Anderson to prove a constructive discharge claim than the Court of Appeals imposed on Ms. Hicks.

23.   While reconsidering a ruling on summary judgment is extraordinary, the recent

case authority from the Eleventh Circuit justifies reconsideration.  At this point, before trial has begun, the Court can reinstate Ms. Anderson's constructive discharge claim.  If, after trial, Defendant believes that the evidence is not sufficient to support the claim, the Court can consider its motion and rule as it sees fit.  On the other hand, if the Court erred in excluding the constructive discharge claim, reversal would mean a new trial on that claim, alone.  Judicial economy justifies the reinstatement of Anderson's constructive discharge claim.

Respectfully submitted,

/s/   Alicia K. Haynes
Alicia K. Haynes
Kenneth D. Haynes
Charles E. Guerrier
Sonya C. Edwards

**OF COUNSEL:**
HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226
Tel: 205-879-0377
Fax: 205-879-3572
akhaynes@haynes-haynes.com

11

# CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2017, I electronically filed the foregoing

with the Clerk of the Court using CM/ECF system which will send notification of

such filing to the following:

Jay St. Clair                                Mac Greaves
Jennifer Fox Swain                           Daniel J. Martin
Katherine Suttle Weinert                     April S. Rogers
LITTLER MENDELSON, P.C.                      JONES WALKER LLP
420 20th Street North                        One Federal Place
Suite 2300                                   Suite 1100
Birmingham, AL 35203-3204                    1819 5th Avenue North
                                             Birmingham, AL 35203


                                   /s/   Charles E. Guerrier
                                   OF COUNSEL